[Civ. No. 22069. Second Dist., Div. One. Nov. 19, 1956.]

FRANK J. MATULA, JR., Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

Grant B. Cooper and Harold Rhoden for Petitioner.

S. Ernest Roll, District Attorney, Jere J. Sullivan and Lewis Watnick, Deputy District Attorneys, for Respondent.

FOURT, J.—Frank J. Matula, Jr., petitioned for a writ of prohibition to be issued to restrain the Superior Court of Los Angeles County from taking any further steps or proceedings as regards the petitioner in the case of *People of the State of California* v. *Frank J. Matula, Jr., (S.C. No. 181844)*.

An indictment charging petitioner with perjury in violation of section 118 of the Penal Code was filed in Los Angeles County on June 7, 1956. On July 25, 1956, a demurrer and motion under section 995 of the Penal Code were heard. On September 19, 1956, the demurrer was overruled and the motion denied and petitioner pled not guilty to the indictment and the case was set for trial on October 25, 1956. Petitioner thereupon filed the present proceeding.

The indictment, in part, reads as follows:

"The said Frank J. Matula, Jr. is accused by the Grand Jury of the County of Los Angeles, State of California, by this indictment of the crime of Perjury in Violation of Section 118, Penal Code of California, a felony, committed prior to the finding of this indictment, and as follows:

"That on or about the 6th day of June, 1955, the Assembly

of the State of California duly and legally enacted House Resolution No. 177; that said House Resolution No. 177 reads as follows:

" 'House Resolution No. 177

" 'Relative to constituting the Assembly Standing Committee on Governmental Efficiency and Economy an interim committee

" 'Resolved by the Assembly of the State of California, As follows:

. . . . . . . . . . . .

" '1. The Assembly Standing Committee on Governmental Efficiency and Economy of the 1955 Regular Session is hereby constituted an interim committee and is authorized and directed to ascertain, *study and analyze all facts relating to the State Government and the government of counties, cities, and districts of this State* and of any department, agency, or subdivision thereof, *particularly with respect to their* organization, *functions, and administration, for the purpose of recommending changes and proposing legislation in order to promote efficiency, to reduce and eliminate costs,* to provide for the consolidation of functions and removal of duplication, *and otherwise to increase the efficiency and effectiveness of the state and local governments* and the agencies and subdivisions thereof, *including but not limited to the operation, effect, administration,* enforcement *and needed revision of any and all laws in any way bearing upon or relating to the subject of this resolution,* and to report thereon to the Assembly, including in the reports its recommendations for appropriate legislation.' '' (Emphasis added.)

It is further set forth in the indictment that in pursuance of the authority and power granted by Resolution Number 177, said committee ''. . . conducted a hearing to determine if it should recommend to the Assembly of the State of California the enactment of new laws, the repeal of existing laws, or the amendment of the existing laws governing the collection and disposal of rubbish and garbage.''

The defendant was duly and regularly sworn and certain questions were put to him. Testimony was given to the effect that many of the men who drive the trucks which collect rubbish in Los Angeles County are members of the Teamsters Union; that many of the checkers who work at the rubbish dumps are also members of the union; that the defendant is the secretary-treasurer of the union; that many of the rubbish collectors in the county were and are members of rubbish

collectors' associations; and further, that the rules, regulations, by-laws, and customs of said rubbish collectors' associations provide and define the terms and conditions under which one rubbish collector may take a customer away from another rubbish collector, and further, that said rules, regulations, by-laws, and customs of said rubbish collectors' associations provide that under certain circumstances the rubbish collector who takes a customer away from another rubbish collector must return the customer to the latter; and further, that said rules, regulations, by-laws, and customs of said rubbish collectors' associations provide that under certain circumstances the rubbish collector who takes a customer away from another rubbish collector must give the latter one or more other customers for the customer originally taken; and further, that said rules, regulations, by-laws, and customs of said rubbish collectors' associations provide that under certain circumstances the rubbish collector who takes a customer away from another rubbish collector must pay to the latter a certain sum of money as compensation for taking said customer; and further, that the said defendant, Frank J. Matula, Jr., had enforced and attempted to enforce the said rules, regulations, by-laws, and customs of said rubbish collectors' associations in the particulars above mentioned by telling and threatening the rubbish collector who had taken a customer away from another rubbish collector in substance that if he did not comply with said rules, regulations, by-laws, and customs as mentioned above that he, the rubbish collector, who had taken the customer would be run out of business, that he would not be permitted to dump his rubbish in the rubbish dumps, and that the place of business of said customer would be picketed. And further, that the said defendant, Frank J. Matula, Jr., had enforced and attempted to enforce the said rules, regulations, by-laws, and customs of said rubbish collectors' associations in the particulars above mentioned by running and driving rubbish collectors who had taken a customer from another rubbish collector out of business by preventing the rubbish collector who had taken a customer away from another rubbish collector from joining said union, by preventing said rubbish collector who had taken a customer away from another rubbish collector from dumping his rubbish in said rubbish dumps, and by picketing the customer whose rubbish collection account had been taken by one rubbish collector from another rubbish collector.

The petitioner set forth in his petition that, "The sole issue

presented by said demurrer and motion was, and by this petition is, whether or not the legislative committee had jurisdiction to hear testimony on, and the power to validly raise, the issue upon which it heard petitioner's testimony.''

Petitioner concedes that the allegedly perjurious testimony given by petitioner was pertinent to issues raised by the committee hearing the testimony. He contends, however, that the issues were not validly raised by the committee, and in raising such issues the committee exceeded the scope of its power to inquire, and therefore was without jurisdiction to receive or consider such testimony.

From the questions put it is apparent that among other things the committee was attempting to determine whether there was a monopoly existent in the garbage and rubbish collection and disposal service in the Los Angeles area; whether such a monopoly (if any) functioned in a manner contrary to the best interests of the general public and whether such a monopoly was able to operate because of understandings and agreements between certain persons representing management and certain persons representing labor.

In *Special Assembly Interim Committee* v. *Southard,* 13 Cal. 2d 497, 503 [90 P.2d 304], it is stated:

'' 'Under these constitutional provisions it is obvious that the major function of the legislature is that of enacting legislation. This power is expressly conferred by the Constitution. This power necessarily presupposes that the members of each house of the legislature must investigate the necessity for legislation. It is impractical that the entire membership should participate in such preliminary investigation. Consequently, it is well settled by practice and decision, that incidental and auxiliary to the express power conferred, the legislature and each house thereof has the inherent and implied power to appoint committees for the purpose of obtaining information concerning proposed legislation and reporting back their findings to the body appointing them. From a practical standpoint this implied power must exist in order that the legislature may properly discharge its functions.' ''

In the case of *In re Battelle,* 207 Cal. 227 [277 P. 725, 65 A.L.R. 1497], the court held that the Legislature had the power to appoint a committee to investigate whether a monopoly existed in the cement industry. The court, among other things, stated (pp. 240-241):

''The power and duty reposed in the legislature and in

each and every member of both houses thereof is obviously that of enacting, and hence, necessarily, of preparing and proceeding to enact wise and well-formed and needful laws . . . and hence, in many instances, in order to the preparation of wise and timely laws the necessity of investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power. This has been recognized from the earliest times in the history of American legislation, both federal and state, and from even earlier epochs in the development of British jurisprudence. (Cases cited.)''

In 11 Cal.Jur.2d, page 512, section 137, it is stated:

''The preliminary ascertainment of facts as a basis for the enactment of legislation is not of itself a legislative function, but is simply ancillary to legislation. Thus, the duty of correlating information and making recommendations is the kind of subsidiary activity which the legislature may perform through its own members, or which it may delegate to others to perform. Intelligent legislation upon the complicated problems of modern society is impossible in the absence of accurate information on the part of the legislators, and any reasonable method for securing such information is proper.'' (See also *Parker* v. *Riley*, 18 Cal.2d 83, 90-91 [113 P.2d 873, 134 A.L.R. 1405].)

Under the present law, so far as we are able to determine, the state has, with the exception of the provisions of articles 1, 2, 3 and 4 of chapter 4, division V of the Health and Safety Code (which purport to regulate and control the pollution of waters in public places), imposed the duty of collecting and disposing of garbage upon the local political subdivisions.

Section 11 of article XI of the California Constitution vests in counties and cities the power to ''make and enforce within its limits all such local, police, *sanitary*, and other regulations as are not in conflict with general laws.'' (Emphasis added.) This provision has been held to vest broad authority in the cities, and municipal ordinances giving a city the exclusive right to gather and collect garbage within the city have been held to be valid as resting upon the police power conferred by the constitutional provision. (*In re Zhiz-huzza*, 147 Cal. 328 [81 P. 955]; *Glass* v. *City of Fresno*, 17 Cal.App.2d 555 [62 P.2d 765].) The same conclusion has been reached with respect to the collection and disposal of rubbish. (*In re Pedrosian*, 124 Cal.App. 692 [13 P.2d 389].)

It has also been held that a city may, instead of collecting

and disposing of garbage and rubbish itself, grant an exclusive privilege to engage in such activities (*In re Santos*, 88 Cal. App. 691 [264 P. 281]; *In re Sozzi*, 54 Cal.App.2d 304 [129 P.2d 40]; *Ponti* v. *Burastero*, 112 Cal.App.2d 846 [247 P.2d 597]). It would seem clear that cities under their police power could choose to regulate the activities of private garbage and rubbish collectors rather than engage in such activities themselves, or grant exclusive contracts to do so (*Glass* v. *City of Fresno, supra,* 17 Cal.App.2d 555).

Counties would appear to possess the same powers since section 11 of article XI of the state Constitution is applicable to counties as well as to cities (*In re Lyons*, 27 Cal.App.2d 182, 184-186 [80 P.2d 745]; 19 Ops. Cal.Atty.Gen. 61).

The Legislature has enacted various statutory provisions giving specific authority to cities, counties and special districts with respect to rubbish collection and disposition. Cities, by gift, purchase, or condemnation, may acquire land within the county where the city is located for garbage disposal sites and rights of way for roadways to the site. Garbage is defined to include inorganic rubbish and refuse (Gov. Code, § 38790). Cities may contract for the collection or disposal or both, of garbage, waste, refuse or rubbish under such terms and conditions as may be prescribed by the legislative body of the city (Health & Saf. Code, § 4250). Counties are authorized to acquire, construct and operate dump sites, incinerators, and other disposal plans for the disposal of combustible or noncombustible garbage or rubbish, or both, and for that purpose may acquire by gift, condemnation or otherwise such property and rights of way as are necessary (Gov. Code, §§ 25820, 25822, and 25824). The board of supervisors may permit cities or other governmental agencies to use such dump sites, incinerators, or other disposal plants (Gov. Code, § 25821). The board may make and enforce all necessary and proper regulations for the use of such disposal facilities. It may charge fees for the use of such facilities and may restrict the use to the inhabitants of the county (Gov. Code, § 25823).

A county may grant franchises or privileges for the collection, disposal, or destruction of garbage, waste and debris only under specified terms and conditions. Such franchises, exclusive or otherwise, may be granted by a county to the best bidder (Health & Saf. Code, §§ 4200 and 4201, as amended by 1955 Stats., ch. 928, §§ 1, 2).

Section 25827 of the Government Code, as added by chapter 928, section 3 of the 1955 Statutes, gives the board of super-

visors of Los Angeles County specific power to collect or contract for the collection, or both, of garbage, waste, or other refuse matters under such terms and conditions as may be prescribed by the board, and, for that purpose, to levy a yearly tax on property within the unincorporated area of the county, excluding territory within existing garbage disposal districts.

The present law also provides for various types of special districts with powers relating to the collection and disposition of garbage and rubbish. Garbage disposal districts, including both incorporated and unincorporated territory, may be formed to provide for the collection and disposal of garbage and other refuse matter in the district (Health & Saf. Code, §§ 4100-4112). The district may enter into contracts for the disposal of garbage and other refuse matter (Health & Saf. Code, § 4121). An annual tax may be levied upon the taxable property in the district to pay the cost of the disposal of garbage and other refuse matter. Garbage and refuse disposal districts may be formed to provide a site for the disposal of garbage and refuse (Health & Saf. Code, §§ 4170-4197). Cities may be included in such districts only with the consent of two-thirds of the members of their governing bodies (Health & Saf. Code, § 4171).

The district may acquire and operate a garbage and refuse disposal site and make and enforce all rules and regulations necessary for the administration of the government of the district and for the operation and maintenance of the site (Health & Saf. Code, § 4180). The district levies an annual property tax (Health & Saf. Code, §§ 4181-4185), and may issue general obligation or revenue bonds (Health & Saf. Code, §§ 4186 and 4186.30). County sanitation districts may be formed with power to acquire and operate a sewerage system and sewage disposal or treatment plant or a refuse collection and disposal system or both (Health & Saf. Code, §§ 4700-4859). Such district may include incorporated areas (Health & Saf. Code, § 4711). However, a refuse collection and disposal system established by such a district may include incorporated territory only upon a majority vote of the governing body of the city (Health & Saf. Code, § 4741.1). The district may levy and collect taxes upon real property in the district and may issue bonds (Health and Saf. Code, §§ 4746, 4747 and 4805). A district may also be organized under the Sanitary District Act of 1923 (Health & Saf. Code, §§ 6400-6916), to acquire, construct, and operate garbage dump sites and garbage collection and disposal systems (Health

& Saf. Code, § 6512). Garbage is defined to include inorganic refuse and rubbish (Health & Saf. Code, § 6406). It is a misdemeanor for any person to operate in any city or town any crematory for the destruction by fire heat of garbage or other refuse except in such a manner as will prevent the propagation of disease through a contamination of the atmosphere of any city or town (Health & Saf. Code, §§ 4300-4302).

■ It is apparent from the foregoing that generally speaking, in California, the regulation and control of garbage and rubbish collection and disposal has been left entirely to the local agencies.

Obviously, any study of the general subject matter which would have as its purpose the recommending of any needed revision of the state laws, first should concern itself with whether the existing state law is sufficient to enable the local governments to cope with the problem. Or, in short, are the local governmental agencies efficiently and adequately providing for, or regulating the collection and disposal of garbage and rubbish in their respective jurisdictions? If the committee determined that such local control or regulation is inadequate, inefficient or ineffective in any way, is this due to any deficiency, inadequacy or ineffectiveness in the state law giving local governments authority over the general subject matter, or is it due to the fact that the subject is of such a nature that the state itself should undertake to regulate the subject matter directly or in its entirety?

Assuming that the committee found that the present system is inadequate or inefficient, then the question would arise as to what course should be followed by the state and that in turn would be affected by what the reasons were for the inadequacy or inefficiency, if any. It might well be that the committee would find that because the local agencies were restricted to their particular territorial limits, the problem is one in which there should be a wider base of operation, if there is to be any solution to it. If this be so, then the state could well adopt certain minimum standards and rules governing such activities, but not occupying the field of regulating and controlling the collection of garbage and rubbish, thereby preserving substantially the present plan. An example of such an approach is set forth in the present law with reference to the operation of crematories. (Health & Saf. Code, §§ 4300, 4301 and 4302.) Or, if it was found that the subject is one which cannot be controlled effectively and efficiently by local government, it might well be that legislation would be recom-

mended which would subject such activities to regulation by a state agency. In our opinion, the police power of the state would include the power to make such regulations, even in chartered cities and certainly in all others. In enacting sections 24198 to 24341, inclusive, of the Health and Safety Code, providing for the creation of air pollution control districts, the Legislature determined that there is a state-wide interest in atmospheric purity and prohibition of air pollution, and that it is not practical or feasible to prevent or reduce such pollution by local, county and city ordinances (Health & Saf. Code, §§ 24198 and 24199). Therefore, it would appear that legislation which regulates in some manner the disposition of rubbish in order to protect against air pollution might well be valid. There are, of course, many other possibilities.

The petitioner herein contends that the committee was investigating a supposed conspiracy between a labor union and certain private business associations, and thereby neither the efficiency nor the economy of any governmental operation was in any way involved—that he in no way interfered with the efficiency or economy of any governmental agency and that therefore the committee had no power or jurisdiction to investigate any such supposed conspiracy.

Petitioner concedes that the indictment is sufficient if the committee had the authority to make the investigation under the terms of the resolution setting up the committee. He sets forth that "the government . . . does not become vested with the *obligation* to perform a service merely because it *may* perform that service, and a private business operation does not become a governmental operation merely because there is enabling legislation which allows the government the option of performing or not performing that operation." Perhaps in general, the petitioner is correct in his contention. However, in this particular instance, dealing with the particular subject matter in question, we do not believe that any such general rule applies.

Garbage has been defined as, "Refuse organic matter in general, more specifically, offal; the refuse animal and vegetable matter from a kitchen, market, or store; the entrails of an animal or fish, refuse parts of flesh, the bowels of an animal, that which is purged or cleansed away, but the term does not necessarily imply the presence of such organic matter, and in its broadest sense, it is sometimes loosely used as meaning anything worthless or filthy, refuse, any worthless,

offensive matter; waste material from a house, market or store, consisting of offal mixed with other refuse, as ashes, paper, tin cans, etc." (38 C.J.S. 189.)

In former days, in small towns and communities, the work of collecting garbage was done primarily by private concerns or each household took care of its own. There are undoubtedly places in California presently where such conditions still prevail. In more populated centers, however, it became impractical for everybody to so conduct themselves, and it became necessary for the political subdivision to assume, on its own account, and for the state, the duty of providing for the disposition of garbage one way or the other. The accumulation of decomposed garbage which is offensive to the smell, of substances which if permitted to remain uncared for would poison the atmosphere and breed diseases, infectious and contagious, among the people of one city, and might well spread statewide, is of course a concern to the entire state.

It was appropriately said in *Gorman* v. *City of Cleveland*, 26 Ohio App. 109 [159 N.E. 136, 137-139]:

"It might be vegetable or animal refuse, or both. It also might be a combination of all the articles named, which, if left uncollected, would ferment, sour, rot and decay, and consequently, unless collected and disposed of, become injurious and deleterious to the public health, to the extent even of producing an epidemic, which might involve not only the community, but the state, because every one coming in contact with it, no matter where residing, might become affected and diseased, and thus a contagion be spread over a much larger territory. Distance would be no bar, because the disease or contagion might be carried wherever a person afflicted might travel. Hence it is not violence to say that it would become the *duty of government*, whether municipal or state, on account of its far-reaching effect, to take cognizance of such a condition, and by the collection and disposal of the refuse prevent disastrous effects by checking it in its incipiency; and it is not unreasonable to suppose that, as a matter of self-defense, in behalf of the body politic, *it becomes the paramount duty of the government itself*, whether municipal or state, to prevent any impending peril by taking immediate steps for the collection and disposal of garbage and rubbish, and not to depend upon people not charged with the public responsibility to eradicate the evil.

"Were the city to leave such an important function to each individual property owner, dire results might follow

from indifference and neglect. Is not that conclusion the inevitable sum and substance of human experience the inevitable logic of the situation? In other words, the necessities of the case make this duty a paramount one to be performed by the government on account of the universal peril that might follow in case of neglect or indifference throughout the entire city and the entire state, for the reasons above given.

. . . . . . . . . . . . . .

"It is a well-settled proposition that with respect to health measures *the duty rests upon the government*. . . .

"That the state of . . . [California] is directly affected by the sanitary condition of the city of . . . [Los Angeles] cannot be denied, for the reason, as above stated, that contagion spreads wherever there is freedom of human locomotion and over any territory where the wind blows. The condition of Cuba and Porto Rico affected the people of all countries, because yellow fever, before its eradication, was a menace not only to this country, but to all others, and if it had been left for the inhabitants to take care of themselves, the contagion would have become universal. We quote this episode because it has become a part of universal history of which courts can take judicial notice.

"If the city of . . . [Los Angeles] should abandon its collection of garbage and refuse [either by making the collection itself, or contracting the work to be done, or otherwise causing the garbage to be collected] within the next 24 hours, the danger of the community and its people within the next 6 months is obvious, for it is a well-established proposition of government that when it comes to public health the community must take care of itself, and that includes the inhabitants and the body politic, and this is based upon the wisdom of the ages, that what is the duty of everybody is the duty of nobody, especially when it pertains to question of public health and public welfare." (Emphasis added.)

██ It is a duty of government to either collect the garbage of the political subdivision, or cause it to be collected, and not just a power of government to collect it or cause it to be collected. ██ Whatever powers a city possesses to remove garbage and refuse are predicated upon the assumption that a failure in this respect would result in a menace and danger to the people of the whole state, and the authority or power to prevent such endangerment stems from the police power of the state. It appears to us that if it is a duty of government under the circumstances, then clearly the committee was

proper, and within its powers and jurisdiction, to investigate whether any of the laws with reference to the subject matter of garbage collection needed revision.

In *Pittam* v. *City of Riverside,* 128 Cal.App. 57, at page 62 [16 P.2d 768], the court said:

"It is well established that the disposal of garbage by a city is the exercise of a governmental function. (*Miller* v. *City of Palo Alto, supra* [208 Cal. 74 (280 P. 108, 109)]; *Manning* v. *City of Pasadena,* 58 Cal.App. 666 [209 P. 253].) The municipality derives the right to provide for garbage disposal from its sovereign powers of preserving the public health. (*In re City & County of San Francisco,* 191 Cal. 172 [215 P. 549]; 13 Cal.Jur. 291.) The same power gives to the city the right to prevent the destruction of the property of its citizens by fire. (*Coleman* v. *City of Oakland, supra* [110 Cal.App. 715 (295 P. 59)].) The collection and disposal of waste materials which constitute a fire hazard should be just as much a governmental function as the collection and disposal of garbage which is a menace to health. (*In re Pedrosian,* 124 Cal.App. 692 [13 P.2d 389].)"

For the reasons heretofore set forth we hold that the Governmental Efficiency and Economy Committee of the Assembly conducted a valid investigation in a matter over which it had jurisdiction, and that the questions put were material and proper, intended as they were to elicit information as to the existence of evils in the present administration of pertinent statutes, and the possible necessity arising therefrom to recommend amendment to, or a change in existing legislation, to the end that the efficiency and effectiveness of the state and local governments in the collection of garbage and rubbish, might be enhanced.

The petition for the writ of prohibition is denied.

White, P. J., and Doran, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied January 16, 1957.