[S.F. No. 24101. Aug. 14, 1980.]

HELEN G. PEREZ, Plaintiff and Appellant, v.
CITY OF SAN BRUNO, Defendant and Respondent.

COUNSEL

Helen G. Perez, in pro. per., for Plaintiff and Appellant.

John G. Schwartz and Nagle, Vale, McDowall & Cotter for Defendant and Respondent.

Elwyn L. Johnson, City Attorney (Modesto), and George H. Eiser III, Deputy City Attorney, as Amici Curiae on behalf of Defendant and Respondent.

OPINION

MANUEL, J.—Plaintiff Helen G. Perez appeals from a judgment of dismissal entered following the granting of a motion for summary judg-

ment in an action seeking damages for invasion of her constitutional rights through discontinuance of water service.

We here confront the question whether a municipality providing water, sewer, and garbage disposal services to its citizens and billing therefor by means of a single unified statement may constitutionally resort to the remedy of cessation of water service when a citizen, refusing to pay that component of the unified billing relating to garbage collection and disposal services but paying the other components thereof, fails to make full and complete payment for municipal services rendered.

The City of San Bruno, acting pursuant to its police power (Cal. Const., art. XI, § 7), has provided in section 14-1 of its city code that "[t]he furnishing of water and sewer service and the collection and disposal of garbage and rubbish, as provided for in this Code, shall constitute municipal services, and shall be charged for as such. [¶] Every person, on making application for municipal services, shall make a service deposit...."

Acting pursuant to explicit provisions of state law (Health & Saf. Code., § 4250) the city has chosen to provide the garbage collection and disposal aspect of its "municipal services" by contracting with a private company. Section 14-7 of the city code provides in this respect: "Any person or firm to whom the city council shall grant a contract for the collection, hauling, gathering and disposing of garbage and rubbish in the city shall be designated the 'official scavenger and garbage collector' of the city. *Every person owning, occupying or in charge of any premises in the city shall, notwithstanding any other provisions of this chapter, engage such official scavenger and garbage collector for the collection and disposal of all garbage and rubbish accumulating, remaining or existing upon any such premises* and shall for such purpose furnish at his own cost and expense a suitable receptacle or garbage can for the keeping and storing of such garbage and rubbish. The city council may from time to time make such arrangements as may seem proper with the official scavenger and garbage collector for the collection by the city or its agents of monthly garbage bills;..." (Italics added.)

Under currently applicable contractual provisions the contractor, the San Bruno Garbage Company, Inc., has agreed to "furnish all labor, material, and equipment required for the collection and removal of garbage [etc.] from all dwellings, business properties, and all other buildings and/or structures within the City," to furnish its own dump

site, and to render the indicated services in accordance with a stated schedule of fees, said schedule being subject to renegotiation between the parties at three-year intervals. Under the terms of the contract the contractor "delegates to [the city] the billing and collecting of garbage and refuse collection charges and agrees to pay to [the city] eighteen (18) percent of all sums collected for said services. It is agreed that Contractor will not hold City responsible for non-collection or for errors in billings, if any, whether through the fault of said City, or its employees, or not."

As further discussed below, the city, pursuant to section 14-1 of its city code (quoted *ante*) includes a charge for garbage collection and disposal on its unified monthly billing covering all "municipal services" —i.e., water, sewer, and garbage. The same section goes on to provide as follows: "No person shall fail or refuse to pay the municipal service charges provided for in this Code. [¶] If any person shall fail or refuse to pay the lawful charges, including both delinquent and current charges, for any municipal services, the water service to the premises, regardless of tenancy, shall be shut off."

In summary the city's system, as we understand it, contemplates that one wishing to avail himself of the city's municipal services, after making application and deposit therefor, becomes entitled to receive all of such services; that the garbage collection and disposal aspect of the municipal services is to be performed by a private company under a contract binding it to remove garbage from all dwellings and other buildings in the city; that each such subscriber to municipal services is required to "engage" the company for this purpose; that the city includes, as a part of its unified billing for municipal services, a fee set by contract for garbage collection and disposal; and that such fees, when collected, are divided between the city and the private company on an 18/82 basis—the city having no liability to the company for uncollected fees.

Plaintiff, who alleges that she disposes of all garbage produced on her premises by means of sanitary recycling techniques, has since 1973 refused to pay that portion of the unified billing for municipal services which relates to garbage collection and disposal. She has made her position in this matter known to city authorities but has been informed that city regulations require use of and payment for garbage collection services by all city residents. Four legal actions have resulted, including that here before us. Two of these were small claims actions by the city,

resulting in judgments for delinquent charges; one of these judgments was affirmed on appeal to the superior court. The third, filed by plaintiff late in 1974, sought damages against the city for mental and emotional distress suffered by her as a result of the city's actions; it was here alleged that the city through its agents had threatened to shut off water service to her premises in order to enforce payment, and that such action, although authorized in the city code, would be unconstitutional; no injunction was sought, however. This action was dismissed after the trial court sustained the city's demurrer without leave to amend.

It appears that in January 1976, the city, having failed to obtain payment from plaintiff relating to the garbage collection and disposal component of her bill for municipal services, shut off her water service; for reasons which do not here appear, service was restored approximately one month later and has continued to the present.[1] In the instant action, filed after denial of a claim against the city, plaintiff seeks damages resulting from the one-month discontinuation of water service, which she claims was in violation of her constitutional rights. The city moved for summary judgment on the grounds "that there is no triable issue of material fact on these issues, and that the action . . . is barred by res judicata, collateral estoppel, and the valid and lawful exercise of police power as a matter of law." The motion was granted, and plaintiff appeals from the ensuing judgment.

## I

■ We do not believe that the instant action is barred by the doctrine of res judicata—which, generally speaking, "precludes parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction." (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 810 [122 P.2d 892].) Plaintiff's 1974 action for damages, insofar as it sought monetary relief against a threatened cessation of water service, was clearly premature, no such cessation having then occurred. Although the record before us does not

---

[1]In 1977 plaintiff obtained a temporary restraining order enjoining the cessation of water service pending trial. In the proceedings leading to the issuance of that order the city indicated that it had no intention of discontinuing water service "pending the lawsuit."

It appears from the record that at the time of the subject discontinuation of water service plaintiff was delinquent on charges for municipal services of $73.48—all of which apparently related to garbage charges. As of February 1978 she was delinquent in the amount of $139.78.

contain the city's demurrer to that action, we must assume that a primary, if not the only, ground of dismissal was that of prematurity. As indicated above, no injunction was sought. In these circumstances we cannot conclude that the judgment of dismissal in the 1974 action was one based on the merits. The instant action, therefore, brought following the occurrence of the event for which relief was sought, is not barred. "Where a judgment is rendered for the defendant on the ground of the non-existence of some fact essential to the plaintiff's cause of action, the plaintiff is not precluded from maintaining an action after such fact has subsequently come into existence." (Rest., Judgments, § 54; see *Erlich* v. *Superior Court* (1965) 63 Cal.2d 551, 556-557 [47 Cal.Rptr. 473, 407 P.2d 649]; *Mercer Casualty Co.* v. *Lewis* (1940) 41 Cal.App.2d 918, 923-924 [108 P.2d 65]; see also Rest.2d, Judgments (Tent. Draft No. 1) § 48.1, subd. (2); 4 Witkin, Cal. Procedure (2d ed. 1971) p. 3317.)

 We do believe, however, that certain issues sought to be raised in the instant proceeding—namely those relating to the defendant city's power to require all residents to subscribe to and make payments assessed by its garbage disposal service whether or not they make actual use of that service—must be deemed presently foreclosed to plaintiff. Pursuant to that aspect of the doctrine of res judicata known as collateral estoppel or issue preclusion "[a]ny issue necessarily decided [by the final determination of a cause of action by a court of competent jurisdiction] is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit on a different cause of action. [Citations.] The rule is based upon the sound public policy of limiting litigation by preventing a party who has had one fair trial on an issue from again drawing it into controversy. [Citations.]" (*Bernhard* v. *Bank of America, supra,* 19 Cal.2d 807, 810-811.) As indicated above, two small claims judgments have been rendered against plaintiff which necessarily determined her liability to make the subject payments; one of these was the subject of a subsequent appeal by her to the superior court, which it, following a trial de novo, affirmed. Included in the record before us is the judgment and memorandum of decision of the small claims court in this action; the court therein expressly addresses the issues here in question, noting plaintiff's contention relative to the effect of her nonuse of the city's disposal system and providing a careful and lucid explanation of the basis of liability, citing relevant authorities. Also contained in the record is the memorandum of decision of the superior court on appeal from the small claims judgment; the court therein, after a trial de novo, expressly holds "that the City was acting

within its powers in imposing the charges for garbage collection even though the defendant [plaintiff here] did not avail herself of the garbage collection services." (See Code Civ. Proc., § 911; Cal. Rules of Court, rule 61 et seq.)

■ In *Sanderson v. Niemann* (1941) 17 Cal.2d 563 [110 P.2d 1025], we held that whereas a judgment of the small claims court may operate to merge with or bar a subsequent proceeding on the same cause of action, it could not be given collateral estoppel effect with respect to common issues arising in a subsequent proceeding on a different cause of action. Our conclusion on this latter point was reached in view of the characteristics of informality inherent in the small claims proceeding. "...[T]here are no attorneys, no pleadings and no legal rules of evidence; there are no juries, and no formal findings are made on the issues presented. At the hearings the presentation of evidence may be sharply curtailed, and the proceedings are often terminated in a short space of time. The awards—although made in accordance with substantive law—are often based on the application of common sense; and the spirit of compromise and conciliation attends the proceedings." (*Id.*, at p. 573; see also Code Civ. Proc., § 117.) In these circumstances, we concluded, a judgment in such an action should not preclude the relitigation of issues decided therein in the context of a subsequent proceeding on a different cause of action. (See also Rest.2d Judgments (Tent. Draft No. 4) § 68.1, subd. (c), reporter's notes, pp. 44-45.)

We did not address in *Sanderson* the question of the effect of an appeal by the small claims defendant to the superior court, and the affirmance by that court of the small claims judgment. We did, however, advert to a number of considerations relevant to a determination of this question. "There are a number of cases which illustrate the application of the doctrine [collateral estoppel or issue preclusion] to inferior courts such as justices' and municipal tribunals, where such courts, though with lesser jurisdiction, nevertheless function as courts of law with some form of pleadings, and in accordance with legal rules of evidence and the right of representation by counsel. In such cases issues can be framed and decided and therefore may be given conclusive effect in a subsequent suit based on a different cause of action." (17 Cal.2d at pp. 574-575.)

The statutes of this state provide, and have long provided, that when a losing defendant in a small claims action takes an appeal of the small

claims judgment to the superior court, "...the action shall be tried anew" in accordance with rules of practice and procedure adopted by the Judicial Council. (Code Civ. Proc., § 117.10.) The relevant Judicial Council rule provides and has long provided that such a trial de novo is to be "conducted pursuant to law and rules in all respects as other trials in the superior court except that no written findings of fact or conclusions of law shall be required." (Cal. Rules of Court, rule 155.) It has recently been held that the right to a jury trial is available as in such "other trials." (*Smith* v. *Superior Court* (1979) 93 Cal.App.3d 977, 979 [156 Cal.Rptr. 149].) In view of these considerations, we think it must be concluded that when a losing defendant in a small claims action invokes his right of appeal to the superior court, and when that court, pursuant to the above provisions, conducts a trial de novo and enters judgment against such appealing defendant, the considerations set forth in our *Sanderson* opinion are not applicable. ▮ Accordingly, unless some other recognized exception to the general rule is here pertinent (see generally, Rest.2d Judgments (Tent. Draft No. 4) § 68.1), it would appear that that rule must here operate to foreclose plaintiff from arguing that the city lacks the power to require all residents to subscribe to its garbage disposal service regardless of actual use thereof.

Even if it be assumed that the legal question of the city's power to impose charges in the indicated circumstances is one of such great public importance that the doctrine of collateral estoppel or issue preclusion should not be applied as a matter of policy (see *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 520, fn. 5 [162 Cal.Rptr. 327, 606 P.2d 362]; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 872 [127 Cal.Rptr. 110, 544 P.2d 1310]; *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749, 758 [22 Cal.Rptr. 14, 371 P.2d 758]; Rest.2d Judgments (Tent. Draft No. 4) §§ 68; 68.1, subds. (b), (e), reporter's notes, pp. 43-44, 46-48), it is manifest that this issue has been properly decided below. It is well established that the city, in the exercise of powers expressly granted it in the Constitution (Cal. Const., art. XI, § 7), may properly provide for the collection and disposal of all residents' garbage by a private contractor (see Health & Saf. Code, § 4250; *Matula* v. *Superior Court* (1956) 146 Cal.App.2d 93, 98-99 [303 P.2d 871]; *Davis* v. *City of Santa Ana* (1952) 108 Cal.App.2d 669, 676-677 [239 P.2d 656]) and may require that even those residents who do not choose to use such services pay all reasonable and nondiscriminatory[2] charges assessed therefor. (See *City*

---

[2]Plaintiff suggests certain residents of the city, most notably those employed by the garbage company, are not required to pay for the collection service. The record neither supports nor refutes this allegation, and we do not address it further.

*of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93, 102-103 [308 P.2d 1].) The fact that a city, pursuant to its constitutional power, might select other means for preventing the accumulation of garbage within its limits—such as, for instance, providing exemption for those able to demonstrate their willingness and ability to dispose personally of all solid wastes generated by them through recycling[3] or other acceptable means[4]—clearly does not preclude a city, in the absence of some contrary provision of state law, from addressing the problem in the manner adopted by defendant.

## II

The question of the kinds and nature of remedies available to cities and other local entities for the collection of charges imposed for utility services provided to citizens is one which has received substantial and explicit attention by the Legislature. Generally speaking, a general law city like defendant which chooses to provide such services itself rather than through formation of a special district is governed in this respect by the provisions of the Revenue Bond Law of 1941 (Gov. Code, § 54300 et seq.),[5] which deals with the operation and financing of various "enterprises"[6] undertaken by a "local agency."[7] The provisions of this act, together with certain relevant provisions found elsewhere, envisage three basic remedies to which a city may have recourse to enforce payment of delinquent charges: (1) an action for unpaid depos-

---

[3]Regarding the community development of recycling facilities, see Government Code sections 68046, 68046.6 and 68047.

[4]There are, needless to say, many unacceptable means by which a person might himself undertake to dispose of garbage and other household refuse. (See Health & Saf. Code, §§ 4300 et seq. (cremation of refuse); 4400, 4401 (dumping in navigable waters); 4476 (contamination); 24390, subds. (b) and (c) (unlawful deposits in litter receptacles); Pen. Code, §§ 374b, 374b.5, and 374e (littering), 592 (dumping rubbish in canals or ditches); Sts. & Hy. Code, § 888.2 (dumping refuse on parkway).)

[5]Unless otherwise indicated, all section references hereafter are to the Government Code.

[6]"'Enterprise' means a revenue-producing improvement, building, system, plant, works, facilities, or undertaking used for or useful for any of the following purposes: [¶] (a) the obtaining, conserving, treating, and supplying of water for domestic use.... [¶] (b) The collection, treatment or disposal of garbage or refuse matter. [¶] (c) the collection, treatment or disposal of sewage, waste or storm water, including drainage. [¶]...." (§ 54309.)

"'Enterprise' includes, but is not limited to, all parts of the enterprise, all appurtenances to it, and: [¶] (a) Lands, easements, rights in land, water rights, *contract rights, and franchises;...*" (§ 54309.1) (Italics added.)

[7]"'Local agency' means any city...authorized to acquire, construct, own, or operate any enterprise as defined in Section 54309." (§ 54307.)

its, charges, and penalties; (2) the imposition of a lien on the real property served; and (3) the cessation of services. We address each of these in detail below.

Before doing so, however, we advert to a provision which appears to have relevance to all remedies available to a city which, like defendant, provides municipal sewer service among the services rendered by it to its residents. Under the provisions of section 54345, such a city or other "local agency" may provide that sewer charges "shall be collected together with and not separately from the charges for any other utility service rendered by it, and that *all charges shall be billed upon the same bill and collected as one item.*" (Italics added.) As indicated above, the City of San Bruno has so provided in its city code. (See also § 54346; Health & Saf. Code, § 5471.)[8]

We turn to the matter of specific remedies.

(1) Section 54353 provides: "As a remedy established for the collection of due and unpaid deposits and charges and the penalties thereon an action may be brought in the name of the local agency in any court of competent jurisdiction against the person or persons who occupied or, in the case of unoccupied property, who owned the property when the service was rendered or the deposit became due or against any person guaranteeing payment of bills, or against any or all of said persons, for the collection of the amount of the deposit or the collection of delinquent charges and all penalties thereon." Section 54347 provides for the collection of charges. Section 54348 provides for the imposition of penalties for nonpayment.

(2) The lien procedure set forth in the Revenue Bond Law of 1941, which would appear to apply to all "enterprises" undertaken by a city or other "local agency," is contained in sections 54354, 54354.5, 54355 and 54356. These provisions contemplate a specific resolution or ordinance, adopted after notice and hearing, declaring that all delinquent charges and penalties, when recorded as provided, shall constitute a lien on the real property served. Insofar as the record before us shows, defendant city has not adopted such a resolution or ordinance.

---

[8]Similar or comparable provisions making specific reference to garbage disposal services exist regarding municipal utility districts (Pub. Util. Code, § 12810); municipal water districts (Wat. Code, § 71689.22); and community services districts (Gov. Code, § 61621).

Section 38790.1 also makes specific provision for the imposition of such a lien by cities collecting garbage fees or charges "in the manner provided in Section 25831 for counties." The meaning of this dispensation, in light of the high degree of extrapolative powers required to take advantage of it, remains unclear. Insofar as the record before us shows, defendant city has not ventured this way.

(3) Section 54346 provides: "If all or part of the bill is not paid, the local agency may discontinue any and all service for which the bill is rendered." This section, immediately following that permitting unified billing for all city services (§ 54345, see text accompanying fn. 8, *ante*), would clearly seem to authorize the action by defendant city which is the subject of the instant lawsuit.[9] The city code, as indicated above, expressly provides that upon failure to pay for "any municipal services, the water services to the premises, regardless of tenancy, shall be shut off."

It is provided in section 54357 that "[r]emedies for collecting and enforcing rates and charges set out in this chapter are cumulative and may be pursued alternately, or any thereof may be used consecutively when the legislative body so determines. . . ."

 It would appear from the foregoing that the remedy invoked by defendant which is the subject of the instant action—i.e., unified billing of all city services accompanied by cessation of water service upon failure to pay the unified billing in full—is authorized by the general law of this state as well as by defendant's ordinances and codes. We are thus brought to the primary question before us: Whether such provisions may be applied in a manner consistent with constitutional due process guarantees (U. S. Const., Amend. XIV, § 1; Cal. Const., art. I, § 7) to permit cessation of water service to enforce payment of a unified but itemized municipal services billing when the only portion thereof remaining unpaid is that relating to municipal garbage collection charges? It is to this question that we now turn.[10]

---

[9] For similar or comparable provisions see, e.g., Public Utilities Code section 12810 (municipal utility districts); Water Code section 71689.22 (municipal water districts); and Government Code section 61621 (community services districts).

[10] It appears that we, unlike the court in the recent case of *Uhl* v. *Ness City, Kansas* (10th Cir. 1979) 590 F.2d 839, must reach and decide the constitutional issue presented. There, in a case factually similar in all relevant respects to that here before us, the trial court had held that "the termination, or threatened termination of public water supplies for failure to pay an unrelated trash collection fee, is arbitrary and unreason-

## III

■ The general rule applied by this and the United States Supreme Court in the examination of police-power enactments against the requirements of the state and federal due process clauses was recently stated by us in the following succinct terms: "In the exercise of its police power [the legislative body] does not violate due process so long as an enactment is procedurally fair and reasonably related to a proper legislative goal. The wisdom of the legislation is not at issue in analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute. (*Nebbia* v. *New York* (1934) 291 U.S. 502, 525 [78 L.Ed. 940, 949-950, 54 S.Ct. 505, 89 A.L.R. 1469]; *Seagram & Sons* v. *Hostetter* (1966) 384 U.S. 35, 47 [16 L.Ed.2d 336, 345, 86 S.Ct. 1254]; *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 869 [76 Cal.Rptr. 642, 452 P.2d 930]; *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 359 [55 Cal. Rptr. 23, 420 P.2d 735].)" (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].)

Leaving the matter of procedural fairness to one side for the moment, we believe that the stated standard is that which is properly applicable in determining whether the substantive requirements of the state and federal due process clauses have here been met. We recognize, of course, that legislation affecting certain specific rights—namely those which either have been afforded express constitutional protection or are of a character so fundamental or "implicit in the concept of ordered liberty" (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 325 [82 L.Ed. 288, 292, 58 S.Ct. 149]) as to require equivalent protection (see, e.g., *Roe* v. *Wade* (1973) 410 U.S. 113, 129, 152-156 [35 L.Ed.2d 147, 163-164, 176-179, 93 S.Ct. 705]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479

---

able, and violates plaintiffs' rights to due process of law under the Fourteenth Amendment." (*Uhl* v. *Ness City, Kansas* (D.Kans. 1975) 406 F.Supp. 1012, 1018.) The court of appeals, however—after terming the constitutional question "interesting and substantial" and noting a considerable split of authority (590 F.2d at p. 841)—declined to reach it, instead affirming on the ground that preemptive state legislation prescribing the method for collection of unpaid garbage and solid waste removal charges established an ad valorem tax levy and lien procedure as the exclusive remedy for nonpayment, precluding the remedy of cessation of water service. As we have indicated, however, the latter remedy is clearly authorized by express statutory provision in this state and, moreover, is made cumulative. Indeed, as we have indicated, a cursory examination of the swarm of statutes relating to this subject matter reveals that explicit authorization of the remedy occurs in a number of related contexts as well. (See fn. 9, *ante*.)

[14 L.Ed.2d 510, 85 S.Ct. 1678])—is subjected to a more searching level of scrutiny than that above indicated,[11] but we do not believe that the "right" to receive municipal water service may be classed in that category.[12] As the United States Supreme Court has recently stated, "the customer's right to continued [water] service is conditioned upon payment of the charges properly due,. . ." (*Memphis Light, Gas & Water Div.* v. *Craft, supra*, 436 U.S. 1, 11 [56 L.Ed.2d 30, 40].) In our view the determination of which charges are "properly due" in light of constitutional demands—and whose nonpayment may therefore justify a discontinuance of service—is to be made in light of traditional due-process standards. We therefore limit the scope of our inquiry to the question whether the legislative scheme set forth in the statutes and ordinances we have considered bears a reasonable relationship to a proper legislative goal.

It is manifest that the provisions here in question are directed toward a proper and legitimate public goal—i.e., the protection of public health. (See generally text accompanying fns. 2-4, *ante*, and authorities cited therein.) The question, then, is whether those provisions may be said to bear a *reasonable* relationship to that laudable goal. To state the matter in specific terms: May a legislative scheme which permits (1) unified billing for all municipal utility services relating to public health protection, and (2) termination of all or any of such services upon failure to make payment in full, be said to bear a reasonable relationship to the goal of public health protection?

The early cases in this area, generally speaking, looked not to the rationality of the unified system in light of the legislative goal but to the functional connection between the terminated service and that for which payment was withheld. Thus if it could be said that the matter for which payment remained due was "unrelated" or "collateral" to the

---

[11]When rights of such fundamental nature are involved, "regulation limiting these rights may be justified only by a 'compelling state interest,' [citations], and. . .legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." (*Roe* v. *Wade, supra*, 410 U.S. at p. 155 [35 L.Ed.2d at p. 178]; see also *Griswold* v. *Connecticut, supra*, 381 U.S. at p. 497 [14 L.Ed.2d at pp. 522-523] (conc. opn.).)

[12]This does not mean, of course, that the availability of water service, albeit conditional, may be terminated without affording some fair procedure to determine whether the requisite conditions are satisfied. (See *Memphis Light, Gas & Water Div.* v. *Craft* (1978) 436 U.S. 1, 9-19 [56 L.Ed.2d 30, 39-45, 98 S.Ct. 1554]; also compare *Dandridge* v. *Williams* (1970) 397 U.S. 471, 484-485 [25 L.Ed.2d 491, 501, 90 S.Ct. 1153] with *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 264 [25 L.Ed.2d 287, 297, 90 S.Ct. 1011].) We address this matter below.

service terminated, termination was held to be foreclosed. (See generally cases collected at Annot. (1974) 60 A.L.R.3d 714.) The rationale appears to have been developed in cases involving water and sewer service, the notion being that because these two services are so functionally "interlocked"—in that neither can be effective without the other—termination of the former for nonpayment of the latter results in no unconstitutional action. (See generally cases collected at Annot. (1952) 26 A.L.R.2d 1359; A.L.R.2d (Later Case Service 1970) p. 271.) At the other extreme are cases in which one of the services involved lacked any demonstrable connection to the goal of public health protection, let alone any functional interconnection. (See, e.g., *Owens* v. *City of Beresford* (1972) 87 S.D. 8 [201 N.W.2d 890, 60 A.L.R.3d 707] (telephone and electrical service/garbage service); *Edris* v. *Sebring Utilities Commission* (Fla.App. 1970) 237 So.2d 585 (water service/electrical service).) In these cases discontinuance of one service for nonpayment of the other has been disallowed.

Between these two extremes lie cases in which both of the services involved are connected with the goal of public health protection but they are not functionally "interlocked" to the extent of water and sewer services. Here we encounter cases such as that at bar, involving the discontinuance of water service for nonpayment of garbage or sanitation charges. We have been able to discover only three cases of this particular kind (excluding the superseded federal district court decision in *Uhl* v. *Ness City, Kansas, supra*, 406 F.Supp. 1012—see fn. 10, *ante.*) In *Garner* v. *City of Aurora* (1948) 149 Neb. 295 [30 N.W.2d 917] the court, following the functional analysis, ignored the common public health aspect of both services and simply applied cases involving electric services, holding garbage collection to be "collateral" to or "independent" from water service and therefore precluding discontinuance of the latter for nonpayment of the former.

In two subsequent cases, however, the courts laid heavy emphasis on the fact that each of the two subject services formed a part of the city's unified public health and sanitation program, questioning the relevance of functional interdependence to the constitutional issue. "It is shown by this record," the court said in *Cassidy* v. *City of Bowling Green* (Ky. App. 1963) 368 S.W.2d 318, "that for public health and sanitation purposes the City furnishes water service, sewerage service, and garbage disposal service. They are all inter-related and the City is under no obligation to furnish any or all of these services except upon the payment of reasonable charges. This public health program, while divided into sep-

arate administrative units, is a single program. Any reasonable method of collection is justified and certainly deprives appellants of no constitutional rights." (*Id.*, at p. 320.)

In *City of Breckenridge* v. *Cozart* (Tex.Civ.App. 1972) 478 S.W.2d 162, the court, after reviewing both *Garner* and *Cassidy*, adopted the reasoning of the latter case. "Environmental conditions have changed radically since the *Aurora* case was decided in 1948," the court noted. It adverted to a recent state statute authorizing discontinuance of any or all other utility services "[t]o aid in enforcing collection of fees for . . . solid waste disposal service. . . ." and held that the city's discontinuance of water service, under the terms of its own ordinance, resulted in no constitutional violation. (*Id.*, at p. 165.)

We believe that the rationale of the *Cassidy* case, adopted in *Cozart*, is properly applicable here. The city, in the exercise of its police power, provides three municipal utility services—i.e., water service, sewer service, and garbage collection and disposal service—all of which bear a clear and demonstrable relationship to the goal of public health protection. Pursuant to express provisions of state law (§§ 54345 and 54346), it has provided by ordinance and city code that these services shall be billed on a unified basis and that upon failure to pay the bill in full water service shall be discontinued. Under applicable constitutional standards these provisions, if procedurally fair (a matter to be considered below), cannot be said to violate the demands of due process if they are "reasonably related to a proper legislative goal." (*Hale* v. *Morgan, supra*, 22 Cal.3d 388, 398.) That relationship is, we think, manifest: In order to encourage and assure the support of all components of the city's public health and sanitation program, it has made the continuance of all of the offered utility services contingent upon the payment for all. The city, in short, has concluded that public health considerations require that all city residents both avail themselves of and provide support for all of the indicated municipal health services rather than picking and choosing among them. Whatever we might think about the advisability or wisdom of such a system, it cannot be gainsaid that it is reasonably related to the proper and legitimate goal sought to be achieved.[13] "The wisdom of the legislation is not at issue in

[13]It is clear, of course, that what we have said cannot be read to suggest that all unified billing procedures for city services are constitutionally authorized. Section 54309, which sets forth the types of "enterprises" which a city might undertake pursuant to the provisions of the Revenue Bond Law of 1941, lists several areas of service which bear no clear connection to the goal of public health protection—e.g., the providing of

analyzing its constitutionality, and neither the availability of less drastic remedial alternatives nor the legislative failure to solve all related ills at once will invalidate a statute." (*Hale* v. *Morgan, supra*, 22 Cal.3d 388, 398.)

It is true, of course, that when a statutory or legislative scheme utilizes a means to reach its end and which is unduly harsh or exacts a penalty which may be deemed oppressive in light of the legitimate objectives sought to be achieved, it may be held to be violative of constitutional due process guarantees. (*Hale* v. *Morgan, supra*; *Walsh* v. *Kirby* (1974) 13 Cal.3d 95, 105-106 [118 Cal.Rptr. 1, 529 P.2d 33]; *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 642 [268 P.2d 723], and cases there cited.) Here, however, we are not concerned with a remedy in the nature of a penalty or exaction. Rather we deal with a system whereby a city, in furtherance of its police power and pursuant to statutory authorization, chooses to make the availability of all municipal utility services relating to public health protection contingent upon payment in full of a unified billing therefor. While those residents who do not choose to take part in the system in accordance with its terms may suffer serious practical consequences in the form of discontinued services, we cannot conclude that an unconstitutional deprivation results.

### IV

In the case of *Memphis Light, Gas & Water Div.* v. *Craft, supra*, 436 U.S. 1, the United States Supreme Court held that when state law precludes the termination of utility service other than for good cause, there arises "a 'legitimate claim of entitlement' within the protection of the Due Process Clause" (*id.*, at pp. 11-12 [56 L.Ed.2d at p. 40]) requiring that a constitutionally adequate notice and hearing procedure be afforded prior to termination in order "to afford reasonable assurance against erroneous or arbitrary withholding of essential services" (*id.*, at p. 18 [56 L.Ed.2d at p. 44]). The form of notice required in such cases is one which is "'reasonably calculated' to inform [customers] of the availability of 'an opportunity to present their objections' to their bills" (*id.*, at p. 14 [56 L.Ed.2d at p. 42]); the necessary hearing is one which provides "an opportunity for the presentation to a designated

---

public parking lots, airports, and golf courses. A situation in which a city, pursuant to sections 54345 and 54346, might undertake to include within its unified billing procedure services other than those of a utility nature relating to public health protection, would present issues not here before us.

employee of a customer's complaint that he is being overcharged or charged for services not rendered" (*id.*, at p. 16 [56 L.Ed.2d at p. 43], fn. omitted). The availability of a remedy by way of injunction is not "an adequate substitute for a pretermination review of the disputed bill with a designated employee." (*Id.*, at p. 20 [56 L.Ed.2d at p. 46].)

Because California law does not permit the termination of utility service to a customer without good cause (*Schultz* v. *Town of Lakeport* (1936) 5 Cal.2d 377, 381-382 [54 P.2d 1110, 55 P.2d 485, 108 A.L.R. 1168]), the requirements set forth in the *Memphis* case are fully applicable here.

Included in the record herein is a delinquency notice mailed to defendant sometime following the one-month termination of water service of which she here complains. We assume that a similar notice was sent her prior to the subject termination. The notice provides inter alia that "[t]he *amount due for utilities* [appearing on the notice] includes the amount, if any, of unpaid charges for water, sewer, and/or garbage service." It also provides: "Local ordinance requires your account to be paid in *full* no later than the date noted below or the respective service will be discontinued without further notice (that is, failure to pay the *amount due for utilities* may result in the discontinuation of your water, sewer, and garbage service. . . .)" A phone number is provided, to be called "if your bill is lost." It is clear that this document did not provide the notice required by *Memphis*; it "was not 'reasonably calculated' to inform [plaintiff] of the availability of 'an opportunity to present [her] objections'" to her bill. (*Memphis, supra*, 436 U.S. at p. 14 [56 L.Ed.2d at p. 42].)

It does not appear that city procedures at the time of the termination here in question provided a specific channel for pretermination review of a disputed bill with a designated employee empowered to resolve such disputes. In this respect as well, then, the city's procedures fell short of that required by the *Memphis* case.

In spite of the foregoing we are reluctant to reverse the instant judgment on the ground of the city's failure, in 1975, to provide the procedural protections required by the 1978 *Memphis* case. As we have indicated, the instant dispute dates back to 1973, when plaintiff first took the position that her nonuse of city garbage collection services should relieve her from that portion of her bill for municipal services which related to garbage collection. Since that time she has apparently

had numerous conversations with city officials in which she has made her position clear. Four legal actions have resulted, one of which yielded a memorandum of decision containing a patient and lucid explanation of the legal basis of her liability for the garbage-collection component of the municipal services bill; the judgment in this latter case was affirmed by the superior court following a trial de novo. Plaintiff's position was clear and well-defined, as was that of the city. Her complaint was not one of inadvertent overcharge or double billing; her complaint was that of the city's system, insofar as it billed her for unused services, was in violation of the substantive requirements of the due process clause. In these circumstances we cannot conclude that her failure to receive notice and hearing of the kind made requisite in *Memphis* prior to the one-month termination of service here in question operated to deprive her of her right to fundamental fairness of procedure.

The judgment is affirmed.

Tobriner, J., Clark, J., and Richardson, J., concurred.

**BIRD, C. J.,** Dissenting.—Today, this court holds that a city which enjoys a virtual monopoly in supplying a vital service (water) breached no duty when it cut off a homeowner's paid-for water supply for nonpayment of a garbage collection bill. I cannot agree.

Under the Constitution, a person is denied due process of law when a "governmental entity vested with broad administrative powers acts in an arbitrary manner so as to affect capriciously the property or property rights of persons subjected to its administrative controls." (*Walsh* v. *Kirby* (1974) 13 Cal.3d 95, 105-106 [118 Cal.Rptr. 1, 529 P.2d 33]; see also U. S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a).)

Although the majority state they recognize that due process may be violated when a statute "is unduly harsh or exacts a penalty which may be deemed oppressive in light of the legitimate objectives sought to be achieved . . ." (maj. opn., *ante*, at p. 893), they quickly conclude that the present ordinance does not impose such a penalty. Again, I cannot agree.

Here, the ordinance *requires* that "If any person shall fail or refuse to pay the lawful charges . . . for any municipal services, the water service to the premises, regardless of tenancy, shall be shut off." (San

Bruno City Code, § 14-1.) It should first be noted that this provision operates without regard to the availability of other, less draconian, means of collection. In this case, the city had obtained judgments for amounts due from plaintiff yet made no showing of attempts to enforce those judgments. Overlooked by the majority is the fact that the city required a "service deposit" before implementing its contract with plaintiff. However, there is no indication that this deposit was insufficient to cover the unpaid garbage bills. The inescapable conclusion is that the city intended to exact a penalty by turning off plaintiff's water.

The arbitrary nature of the ordinance is further shown by the fact that water, clearly a necessity of life, is singled out for termination no matter which municipal service has not been paid. Further, the termination of water service is not interrelated nor the billing "unified" with other services. The ledger supplied by the city shows separate columns of amounts charged for garbage, sewer, and water services. Moreover, the city in filing suit for the back garbage charges implicitly admitted the severability of those charges from other items of the bill.

It is only to state the obvious to note that a person cannot exist without water. This court has a history of protecting necessities of life from arbitrary governmental interference. Even a prejudgment attachment scheme which affords notice of hearing and other procedural guarantees must exempt necessities from such attachment as an initial matter. (See *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 563 [96 Cal. Rptr. 709, 488 P.2d 13]; see also 11 Cal. Law Revision Com. Rep. (1973) p. 724.)

A "law must not be unreasonable, arbitrary or capricious but must have a real and substantial relation to the object sought to be attained." (*Gray* v. *Whitmore* (1971) 17 Cal.App.3d 1, 21 [94 Cal.Rptr. 904].) From the record before this court, the present ordinance fails to meet that test. Since the city has not shown that "there is no triable issue as to any material fact and that [it] is entitled to judgment as a matter of law" (Code Civ. Proc., § 437c), the judgment of the trial court should be reversed.

Newman, J., concurred.

**MOSK, J.,** Dissenting.—I agree with the dissenting opinion of the Chief Justice that the San Bruno City Code section 14-1 requiring water service to be terminated for failure to pay charges for *any* municipal

services cannot withstand scrutiny under California Constitution article I, section 7, subdivision (a), either on its face, or certainly as applied here. The fundamental charter of our state protects all persons from deprivation of life without due process; it seems obvious that the arbitrary denial of water—merely to satisfy a civil debt—imperils life and thus cannot be reconciled with the process due any person in a constitutional society. (See *Memphis Light, Gas & Water Div.* v. *Craft* (1978) 461 U.S. 1 [56 L.Ed.2d 30, 98 S.Ct. 1554].)

The city has ample remedies to employ against a recalcitrant homeowner. It may obtain a civil judgment for an unpaid municipal service bill. That was done through small claims court, but curiously the city has not attempted to satisfy its judgment. It may also terminate that service for which payment has not been made. When it attempts, however, to shut off water—a necessity of life—to satisfy a debt for garbage collection, it transcends constitutional or statutory authority.

The statute upon which the majority rely is Government Code section 54346, but I find that reliance to be misplaced. The section provides that if the bill is not paid in full a local agency "may discontinue any and all *service for which the bill is rendered*" (italics added). It is unquestioned here that the bill was rendered and unpaid only for garbage collection service. In my view the city was thus permitted to discontinue that service and that service alone, a remedy in which Mrs. Perez would have enthusiastically acquiesced. Had the city adopted that rational course, it would have avoided a Simon Legree image and the courts would have been spared this unnecessary litigation.

The contention that water service, sewerage service, and garbage disposal service are interlocking components of a public health program has a certain superficial appeal. But the fact is that in this instance each is separately calculated, particularly the garbage collection which is undertaken by a private business enterprise and not by a department of the municipal government.

As the majority indicate, there are no cases on this subject in California and remarkably few anywhere. Perhaps that is because a general rule has long been accepted that a public utility corporation cannot refuse to render the service which it is authorized to furnish, because of some collateral matter not related to that service. This rule, and its specific application denying to a public service corporation any right to refuse its public service because the patron is in arrears with it on ac-

count of some collateral or independent transaction, not strictly connected with the particular service, has been generally applied to deny the right of a municipality to cut off a service provided by it to one of its residents for his failure to pay for another unrelated service provided by the municipality. (60 A.L.R.3d 715-716.)

The only exception to the foregoing rule is if the services rendered by the utility or the municipality are identical in nature or so closely related that they may be said to interlock. The only case directly in point was decided by the Nebraska Supreme Court. In *Garner v. City of Aurora* (1948) 149 Neb. 295 [30 N.W.2d 917], a city collected garbage and trash and, like the instant case, submitted one bill to homeowners. For failure to pay the delinquent garbage collection portion of the bill, the water service to petitioner was terminated. The court enjoined the city from disconnecting water service, holding that garbage collection and water service are separate and distinct provisions. (Also see *Owens v. City of Beresford* (1972) 87 S.D. 8 [201 N.W.2d 890, 60 A.L.R.3d 707].)

Our Legislature has consistently frowned upon the arbitrary termination of essential utility services. Where improperly undertaken by a private landlord severe civil sanctions are authorized. (Civ. Code, § 789.3; *Kinney v. Vaccari* (1980) 27 Cal.3d 348 [165 Cal.Rptr. 787, 612 P.2d 877].) Specific due process requirements have been prescribed prior to termination of service by a public utility. (Pub. Util. Code, §§ 779, 780.) What is improper conduct for a private landlord and for a public utility would seem to be equally improper for a municipality. Here the city has acted inconsistently with the implied legislative intent to prevent unnecessary denial of utility service. Such insensitive conduct demonstrates that to a bureaucrat with a hammer in his hand everything looks like a nail.

Mrs. Perez, who has acted in propria persona throughout these proceedings, has undoubtedly annoyed city officials by insisting that one should not pay for municipal services unneeded and unused. Of such quiet heroics are martyrs born.[1] Two and a half decades ago Mrs. Rosa

---

[1]The city officials apparently agree with Justice Oliver Wendell Holmes who once wrote: "I do despise a martyr. He is a pigheaded adherent of an inadequate idea." (Howe, Holmes-Laski Letters (1953) p. 119.) And later he added that "martyrs were apt to be damned fools." (*Id.*, p. 227.) Yet history has demonstrated over and again that principled zealots frequently achieve an ultimate transition from obloquy to apotheosis.

Parks annoyed the officials of Montgomery, Alabama, simply by insisting that she should not be required to sit in the back of the bus. (Kluger, Simple Justice (1975) p. 750.) Just as Mrs. Parks resisted bureaucracy for a principle—and ultimately brought about the end of compulsory segregation in the south—so Mrs. Perez in apparent splendid solitude is resisting a municipal bureaucracy for a principle. Although the majority fail to see it, I believe due process and justice are her companions.

I would reverse the judgment.

Newman, J., concurred.

Appellant's petition for a rehearing was denied September 11, 1980. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.