Filed 9/16/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHERYL SANDERS, | |
| Plaintiff and Respondent, | G047440 |
| v. | (Super. Ct. No. 30-2010-00435218) |
| CONSTANCE WALSH et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Charles Margines, Judge.  Affirmed.

Law Offices of Chandler Parker, Chandler A. Parker and Kevin Doran for Defendants and Appellants.

Timothy P. Miller for Plaintiff and Respondent.

\*          \*          \*

Plaintiff Cheryl Sanders sued defendants Constance Walsh and Wiggin Out Salons, Inc. (Wiggin Out), over allegedly defamatory statements posted online. After a bench trial, the court entered judgment for plaintiff, awarding compensatory and punitive damages. Defendants raise five contentions on appeal: (1) The defamatory statements were nonactionable opinion; (2) the court erred in finding they were collaterally estopped from relitigating issues previously decided in a small claims action; (3) the court erred in excluding evidence of plaintiff's prior felony conviction, which was previously dismissed pursuant to Penal Code section 1203.4; (4) there was insufficient evidence to support a finding of malice related to punitive damages; and, finally, (5) they challenge certain discovery orders in favor of a third party.

We affirm. We reject all of the alleged errors with the exception of the finding that defendants were collaterally estopped from relitigating issues decided in a small claims action. But we find that error was harmless.

FACTS

This case arises from an aborted sale of a wig. In June 2009, plaintiff's mother purchased a wig from defendant Wiggin Out due to the loss of her hair while undergoing chemotherapy treatment for breast cancer. Walsh is the owner of Wiggin Out. According to plaintiff, Walsh represented that the wig was custom made. Walsh denies making that statement. Plaintiff tendered a check on her mother's behalf from West Coast Building Contractors (West Coast), a corporation she formed with her husband, for which she was still an authorized check signer. After realizing the wig was, in fact, not custom made, plaintiff's mother attempted to cancel the contract and return the wig. Plaintiff stopped payment on the check.

In July 2009, Wiggin Out filed a small claims action against plaintiff's mother alleging breach of contract. Wiggin Out contended plaintiff's mother had not

2

attempted to return the wig and cancel the contract. Plaintiff, on behalf of her mother, submitted into evidence a letter issued by Federal Express (FedEx) confirming the package had been sent to Wiggin Out and refused. Wiggin Out argued the letter presented by plaintiff was fraudulent.

Plaintiff's mother prevailed in the small claims action. The small claims court made the following findings: "[Plaintiff's mother] does not owe [Wiggin Out] any money on [Wiggin Out's] Claim. The Court finds [Wiggin Out] made statements to [plaintiff's mother] to induce [her] to purchase the wig. Said statements were materially false, [at a] time that [Wiggin Out] knew said statements to be false and misleading. Court finds [plaintiff's mother] detrimentally relied on [Wiggin Out's] statements, believed them in good faith to be true. Upon discovering [Wiggin Out's] deceptions [plaintiff's mother] attempted to cancel the contract and return the wig. [Wiggin Out] refused to accept the wig as redelivered by [plaintiff's mother] and claims monies owed on the initial contract. Court finds [plaintiff's mother] owes no monies to [Wiggin Out]. Judgment for [plaintiff's mother]."

Two months later Walsh and Wiggin Out published a lengthy "rebuttal" to an online posting on Ripoffreport.com regarding the circumstances of the small claims action.[1] The rebuttal consists of a series of paragraphs prefaced by "Fact:" explaining defendants' version of the facts, with editorial commentary interspersed throughout. There were, essentially, two allegedly defamatory statements made: first, that plaintiff used an "unauthorized" check to purchase the wig, and, second, that plaintiff fabricated a letter from FedEx to try to prove plaintiff's mother attempted to return the wig to Wiggin Out.

The statement concerning the unauthorized check was as follows: "Fact: [Cheryl's mother] Came in and bought the wig the same day. Had it cut and colored the

---

[1] In this opinion we set forth the Internet postings with the same punctuation, spelling, grammar, and capitalization errors appearing in the original.

3

same day. The family rejoiced at how beautiful it looked.  Fact: Cheryl Saunders who works for the City of Anneheim, CA . . . wrote an unauthorized check out of her boyfriends (she told us it was her husbands account that Day) from West Coast Building Contractors out of Annehiem and at the bottom by the 'notes section' wrote that it was a 'Prosthetic Donation.'"

The statements concerning the allegedly fabricated FedEx letter were as follows:  "Fact: New court date. Cheryl Saunders came into court with a made up letter from Fed Ex stating that 'Constance Walsh opened the package and saw what was in it and gave it back to Fed Ex.'"  "Now we have [Cheryl's mother] (first court date saying that we had the wig) and now Cherly turning in a falsified document with a cut and pasted Fed Ex label and no Fed Ex Address with bogus info attached."  "Fact: Because of the actual lies and fabrication that came out of Cheryl and [her mother's] mouths that day in court we thought for sure that we had won. But unfortunatly we learned that small claims does not go by the law. Small claim judges go by their own laws. So the law did not pertain in this case nor did the fact that purgury took place and false evidence was submitted and not followed up."

Several months later, an anonymous author posted the following on the Web site Yelp.com:  "Investigation on the City of Anaheim? Cheryl Sanders in the planning dept. We all know what is going on in the City of Anaheim planning dept. Our residents are tired of our tax dollars being sunk into the City of Anaheim, into the planning dept and into the friends and family members (sub-contractors) of the employees of the planning department! How much extra 'under the table' money is being made from our planning dept?????  A nice detailed audit and internal investigation will fix this rather quickly as we have demanded one from our government! We the residents of Anaheim are tired of the Planning Dept. planning for themselves and not our community. We hope that people like Cheryl Sanders are investigated, audited and brought to justice!!!!!! We are tired City of Anaheim and the people are now joining

4

together to bring justice to our community! Oh, I agree on keeping our own lawns in order, however we cannot let the city 'flip and spin' the responsibility back on to its residents!! This is an old trick and now its our turn to make the city of Anaheim responsible for its dishonest acts that are happening behind closed doors!"

The same day, an anonymous author posted the following statements on the Web site MerchantCircle.com: "Thank you Cheryl Sanders for hurting the community by giving all the construction business in Anaheim for a under the table bribe. I hope that an investigation takes place soon and you end up behind bars." "Cheryl Sanders at the City of Anaheim Planning Dept. has been putting up a front long enough. We hope to bring you down soon. Your dishonesty and greediness will soon come to an end." Upon reading these postings, plaintiff was "devastated" and concerned about losing her job and livelihood.

Shortly thereafter, plaintiff filed a complaint against Does, later amended to name Walsh and Wiggin Out, alleging causes of action for libel, false light, and intentional and negligent infliction of emotional distress. Walsh and Wiggin Out answered, asserting an affirmative defense of, among other things, truth.

After plaintiff filed her first amended complaint, Walsh called plaintiff offering to take the Internet postings down.

Prior to trial, plaintiff moved in limine to exclude evidence and argument that would dispute or contradict the findings made by the court in the small claims action. Plaintiff claimed defendants were collaterally estopped from relitigating such issues.

The motion was directed at four factual issues: (1) Whether the FedEx letter confirming the attempted return of the wig was fraudulent; (2) whether plaintiff acted dishonestly in stopping payment on the check for the wig; (3) whether plaintiff had authorization to use the corporate check from West Coast; and (4) whether plaintiff committed promissory fraud regarding her intention to honor the check. The court held

that defendants were estopped from contesting the first issue, the authenticity of the FedEx letter, but not the remaining issues.

At trial plaintiff testified, contrary to the Yelp.com and MerchantCircle.com postings, that she did not work in the planning department at the City of Anaheim, but instead the public utilities department, that she had no control whatsoever over who was awarded city contracts, and that none of her friends or family did any contracting work for the City of Anaheim. She further testified there had been no investigations of her and that her reviews at work had been consistently positive. However, due to the recent scandal in the City of Bell and the increased scrutiny on city employees, she felt compelled to reveal the posts concerning the alleged bribery and corruption to her supervisor at the City of Anaheim. Doing so was humiliating. She was also embarrassed at the prospect of citizens or her acquaintances discovering the postings, and believes her future prospects for promotion are limited by the existence of the postings.

Walsh testified and admitted authoring the Ripoffreport.com posting but denied responsibility for the Yelp.com and MerchantCircle.com postings. Walsh had admitted in discovery responses, however, that the e-mail address kerrywells67@gmail.com, which was associated with the Yelp.com postings and MerchantCircle.com postings, was hers. Further, plaintiff presented expert testimony tying the e-mail address used in the Yelp.com and MerchantCircle.com postings to Walsh and Wiggin Out.

After a bench trial the court found each of the statements in the Ripoffreport.com, Yelp.com, and MerchantCircle.com postings were made by Walsh and Wiggin Out and were false and defamatory. The court awarded plaintiff $10,000 on her intentional infliction of emotional distress claim and another $10,000 on her defamation claim. The court then held a punitive damages phase of the trial and found defendant

6

Walsh acted with malice. The court awarded $4,000 in punitive damages against Walsh. Defendants timely appealed.

## DISCUSSION

*The Defamatory Statements Were Not Mere Opinion*

Defendants first contend the various Web postings did not constitute factual claims, but instead nonactionable opinion. We disagree.

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. [Citation.] Civil Code section 45 provides, 'Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.'" (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.)

"'The sine qua non of recovery for defamation . . . is the existence of falsehood.' [Citation.] Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).)

"That does not mean that statements of opinion enjoy blanket protection. [Citation.] On the contrary, where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. [Citation.] The critical question is not whether a statement is fact or opinion, but '"whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact."'" (*Wong v. Jing*, *supra*, 189 Cal.App.4th at p. 1370.)

7

"To determine whether a statement is actionable fact or nonactionable opinion, courts use a totality of the circumstances test of whether the statement in question communicates or implies a provably false statement of fact. [Citation.] Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. . . . [¶] Next, the context in which the statement was made must be considered.'" (*McGarry, supra,* 154 Cal.App.4th at p. 113.)

"The 'crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. [Citation.]' [Citation.] 'Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood. [Citations.]' [Citation.] The question is '"whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. . . ."'" (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696 (*Summit Bank*).)

Defendants sum up their argument as follows: "[Defendants'] statements concerning [plaintiff] are not defamatory per se as a matter of law because they cannot be reasonably viewed as declaring or implying a provably false factual assertion when considering the context and medium in which they were conveyed. Specifically, [defendants'] statements on Ripoffreport.com were published along with, and in response to, other statements which disclosed the underlying factual dispute in the small claims case. Thus, no reasonable reader would consider [defendants'] statements on Ripoffreport.com anything but the opinion of the author drawn from the related circumstances. Similarly, [defendants'] internet postings [on] Yelp.com and MerchantCircle.com were not actionable defamation because the statements lacked specificity and were posted on an internet review site where most readers expect to see strongly worded opinions rather than facts."

8

In support of their position, defendants rely on *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154 (*Krinsky*), which states, "[T]he relative anonymity afforded by the Internet forum promotes a looser, more relaxed communication style. Users are able to engage freely in informal debate and criticism, leading many to substitute gossip for accurate reporting and often to adopt a provocative, even combative tone. As one commentator has observed, online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas: 'Hyperbole and exaggeration are common, and "venting" is at least as common as careful and considered argumentation. The fact that many Internet speakers employ online pseudonyms tends to heighten this sense that "anything goes," and some commentators have likened cyberspace to a frontier society free from the conventions and constraints that limit discourse in the real world.'" (*Id.* at pp. 1162-1163.) Defendants also rely on *Summit Bank*, *supra*, 206 Cal.App.4th 669, which, taking its cue from a law review article, opined that readers of a Craigslist.com section entitled "Rants and Raves" "should be predisposed to view" (*id*. at p. 696) statements therein "with a certain amount of skepticism, and with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts. '[A]ny reader familiar with the culture of . . . most electronic bulletin boards . . . would know that board culture encourages discussion participants to play fast and loose with facts. . . . Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their statements accordingly.'" (*Id.* at pp. 696-697, fn. omitted.)

The net result of these pronouncements has been that some courts are less willing to find *implied* assertions of fact in online postings. In *Krinsky*, for example, an online poster referred to company executives as "boobs, losers and crooks," and said of one female executive, "'I will reciprocate felatoin [*sic*] with Lisa even though she has fat thighs, a fake medical degree, 'queefs' and has poor feminine hygiene.'" (*Krinsky*, *supra*, 159 Cal.App.4th at pp. 1176-1177.) The court refused to interpret the comments

9

as asserting facts, stating, "A reasonable reader of this diatribe would not comprehend the harsh language and belligerent tone as anything more than an irrational, vituperative expression of contempt for the three officers of SFBC and their supporters." (*Id*. at p. 1176) "The language is unquestionably vulgar and insulting, but nothing in this post suggested that the author was imparting knowledge of actual facts to the reader." (*Id.* at p. 1177.)

Similarly, in *Summit Bank* the court refused to find implied assertions of fact in Internet postings on the "Rants and Raves" section of Craigslist.org stating a bank chief executive officer "thinks the Bank is her personel [*sic*] Bank to do with it as she pleases," that the bank is a "'problem bank,'" and that the closure of a particular bank branch left customers "'high and dry.'" (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 698.) Likewise, in *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, the court ruled the following internet statements critical of the plaintiff company were nondefamatory: "'When the people who have . . . been duped into this stock realize the scam they were coaxed into, my guess is there will be hell to pay.'" (*Id.* at p. 1013.) "'You guys really seem to think you can sucker a lot of people all the time!'" (*Ibid.*) "'[W]ill someone please tell me why ANYONE would believe ANYTHING these guys and their pump and dump supporters say?'" (*Ibid.*)

Here, however, we are not confronted with vague implications of fact, but with specific factual claims. Defendants' post on Ripoffreport.com prefaced most of its many paragraphs with "fact:" and then recited alleged historical facts detailing perjury and fraud by Cheryl Sanders. The Yelp.com posting mentioned Cheryl Sanders in connection with awarding city contracts to friends and family members and taking under the table money, i.e., bribes. The MerchantCircle.com article was even more explicit, accusing Cheryl Sanders of "giving all the construction business in Anaheim for a under the table bribe." These statements are not mere opinion.

While courts have recognized that online posters often "'play fast and loose with facts'" (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 696), this should not be taken to mean online commentators are immune from defamation liability. *Krinsky*, *supra*, 159 Cal.App.4th 1154, upon which defendants rely, is to the contrary. There the issue was, in a defamation action, under what conditions will courts enforce a subpoena to an Internet service provider to reveal the identity of an anonymous Internet author. *Krinsky* held the plaintiff must first make a prima facie showing of defamation. (*Id*. at p. 1172.) This implies, of course, that such a showing is possible. Nor do the cases stand for the proposition that online commentary is pure opinion per se. Where specific, false factual allegations are published and they cause damage, a defamation action will lie. That was the case here.

*The Court Erred In Applying Collateral Estoppel to the Small Claims Action*

The court applied principles of collateral estoppel to prevent defendants from introducing evidence of the truth of their claim that plaintiff produced a fraudulent letter in the small claims action, purportedly from FedEx, confirming the attempted return of the wig. The court relied on *Pitzen v. Superior Court* (2004) 120 Cal.App.4th 1374 (*Pitzen*), which held, "[W]e can perceive of no rationale for refusing to afford collateral estoppel effect to claims litigated and decided *against* a small claims plaintiff. Fundamental fairness dictates that such a plaintiff, having chosen to litigate in an informal setting by bringing an action in small claims court, cannot cite the informality of that forum to gain a second chance to litigate a previously decided issue in a related matter. Allowing a small claims plaintiff to relitigate an issue already decided against him in the forum of his choice is inconsistent with the public policy that 'a plaintiff electing to proceed in a small claims court is to be *finally* bound by an adverse judgment.'" (*Id*. at p. 1386.) The court correctly interpreted and applied *Pitzen*. We hold, however, that *Pitzen* was wrongly decided.

11

The controlling precedent in this case is *Sanderson v. Niemann* (1941) 17 Cal.2d 563 (*Sanderson*), which establishes that collateral estoppel does not apply to a small claims action.   In *Sanderson* the plaintiff brought suit for personal injuries arising from a car accident.  The plaintiff's husband, who was in the car with his wife at the time of the accident, had previously sued the defendant for his own injuries in small claims court.  (*Id.* at p. 565.)  Plaintiff argued that defendant, the other driver, was precluded from relitigating the issue of his negligence because the small claims judge had adjudicated that issue against defendant in the small claims action.  (*Id.* at p. 573.)

Our Supreme Court disagreed, stating, "It is apparent that such a court was established in order to offer a means of obtaining speedy settlement of claims of small amounts.  The theory behind its organization is that only by escaping from the complexity and delay of the normal course of litigation could anything be gained in a legal proceeding which may involve a small sum.  Consequently, the small claims court functions informally and expeditiously.  The chief characteristics of its proceedings are that there are no attorneys, no pleadings and no legal rules of evidence; there are no juries, and no formal findings are made on the issues presented.  At the hearings the presentation of evidence may be sharply curtailed, and the proceedings are often terminated in a short space of time. The awards — although made in accordance with substantive law — are often based on the application of common sense; and the spirit of compromise and conciliation attends the proceedings.  [Citations.]

"An examination of the significant portions of the California statute creating a small claims court serves to emphasize its peculiarly informal character. The action is commenced by an affidavit which states a claim for money due from the defendant, with no indication of the nature of the claim.  [Citation.]  The claim must be prosecuted and defended by the parties themselves without the aid of attorneys.  [Citation.]  No formal pleading, other than the claim and notice, is necessary, and the hearing and disposition of all such actions is informal, 'with the sole object of dispensing

12

speedy justice between the parties' [citation]. The judge or justice may also informally make any investigation of the controversy between the parties 'either in or out of court and give judgment and make such orders as to time of payment or otherwise as may, by him, be deemed to be right and just' [citation]. The judgment is conclusive upon the plaintiff; only the defendant may appeal [citation].

"The foregoing characteristics are of the utmost significance in disclosing sound theoretical grounds for refusing to apply the second aspect of the doctrine of *res judicata* [i.e., collateral estoppel] to judgments of small claims courts." (*Sanderson*, *supra*, 17 Cal.2d at pp. 573-574.) The court distinguished small claims courts from the now-defunct municipal courts, noting that collateral estoppel *did* apply to municipal courts because they "function[ed] as courts of law with some form of pleadings, and in accordance with legal rules of evidence and the right of representation by counsel." (*Id.* at pp. 574-575.)

Small claims actions have not changed substantially since the *Sanderson* decision. "No formal pleading, other than the claim described in [Code of Civil Procedure] section 116.320 or 116.360, is necessary to initiate a small claims action." (Code Civ. Proc. § 116.310, subd. (a).) "The pretrial discovery procedures described in [Code of Civil Procedure] Section 2019.010 are not permitted in small claims actions." (Code Civ. Proc. § 116.310, subd. (b).) The discovery methods listed in code of Civil Procedure section 2019.010, which are not available in a small claims action, are: "(a) Oral and written depositions"; "(b) Interrogatories to a party"; "(c) Inspections of documents, things, and places"; "(d) Physical and mental examinations"; "(e) Requests for admissions"; and "(f) Simultaneous exchanges of expert trial witness information." "The hearing and disposition of the small claims action shall be informal, the object being to dispense justice promptly, fairly, and inexpensively." (Code Civ. Proc. § 116.510.) With limited exceptions, "no attorney may take part in the conduct or defense of a small claims action." (Code Civ. Proc. § 116.530, subd. (a).) "The plaintiff

13

in a small claims action shall have no right to appeal the judgment on the plaintiff's claim . . . ." (Code Civ. Proc. § 116.710, subd. (a).) Appeals to the superior court are conducted using essentially the same rules, with the exception that attorneys may appear on behalf of the parties. (Code of Civ. Proc. § 116.770, subd. (c).) Absent intervening law, therefore, the rule announced in *Sanderson*, *supra*, 17 Cal.2d 563, is still binding.

In *Perez v. City of San Bruno* (1980) 27 Cal.3d 875 (*Perez*), our Supreme Court carved out an exception to the *Sanderson* rule, but that exception has been superseded by statute, and in any event would not apply here and did not apply in *Pitzen*, *supra*, 120 Cal.App.4th 1374.

In *Perez* the plaintiff refused to pay her bill for municipal services because the garbage collection charge was lumped together with the water charge, and plaintiff disposed of her own garbage using sanitary methods. (*Perez*, *supra*, 27 Cal.3d at pp. 880-881.) The City of San Bruno insisted she was required to pay the entire bill, including a charge for garbage collection and disposal service, and when she refused, the city shut off plaintiff's water service. The city had successfully brought two small claims actions to recover on the unpaid bills, one of which was affirmed by the superior court on appeal. (*Id.* at pp. 881-882.) Plaintiff later brought suit to recover damages the cessation of water service caused her. (*Id.* at p. 882.)

Our Supreme Court held the small claims action that was affirmed on appeal to the superior court collaterally estopped plaintiff from relitigating the issue of whether the city had the authority to compel plaintiff to pay for garbage services even though she did not use them. (*Perez*, *supra*, 27 Cal.3d at p. 883.) The court noted the general rule announced in *Sanderson*, *supra*, 17 Cal.3d 523, that collateral estoppel does not apply to small claims judgments due to "the characteristics of informality inherent in the small claims proceeding." (*Perez*, at p. 884.) At that time, however, appeals to the superior court resulted in a trial de novo "'pursuant to law and rules in all respects as other trials in the superior court except that no written findings of fact or conclusions of

14

law shall be required.'" (*Id.* at p. 885.) This included the right to a jury trial. (*Ibid.*) Accordingly, the court concluded collateral estoppel "must here operate to foreclose plaintiff from arguing that the city lacks the power to require all residents to subscribe to its garbage disposal service regardless of actual use thereof." (*Ibid.*)

Critically, appeals to the superior court no longer result in new trials in accordance with the usual rules of civil procedure and evidence, as was the case when *Perez* was decided, but instead result in new hearings using essentially the same rules as apply in the small claims hearing (the notable exception being attorneys may participate). (Code of Civ. Proc. § 116.770, subd. (c); *Rosse v. DeSoto Cab Co.* (1995) 34 Cal.App.4th 1047, 1052.) This led the court in *Rosse* to conclude, "As the premise of *Perez* has been undermined, its holding is no longer sound. The rationale of *Sanderson* is now as pertinent to de novo as to original proceedings." (*Rosse*, at p. 1052.) Accordingly, the *Rosse* court held "collateral estoppel has no application to small claims judgments . . . ." (*Id.* at p. 1049.)

It was against this backdrop that the court in *Pitzen*, *supra*, 120 Cal.App.4th 1374, held that plaintiffs in a small claims action are collaterally estopped from relitigating issues decided in a small claims action. *Pitzen* attempted to distinguish the foregoing line of cases on two bases.

First, *Pitzen* noted, "These cases suggest that a primary factor in determining whether to give collateral estoppel effect to a prior final judgment is whether the record in the former proceeding adequately reflects the issues actually litigated and decided in that proceeding." (*Pitzen*, *supra*, 120 Cal.App.4th at p. 1384.) "Thus, although the broad language of these decisions suggests that small claims judgments may not be afforded collateral estoppel effect, the basis for this exception to the usual application of collateral estoppel is attenuated where the record is adequate to reliably determine which issues were litigated and decided in the small claims action." (*Id*. at p. 1385.)

15

In our view, *Pitzen's* interpretation of *Sanderson* and its progeny was incorrect. The *Sanderson* holding is based on the overall informality of small claims hearings. To be sure, the lack of a requirement of written findings is one aspect of the informality of that scheme, but *Sanderson* did not accord that factor special priority. Equally important, if not more so, is the exclusion of attorneys, prohibition on pretrial discovery, and inapplicability of the usual procedures and evidentiary requirements attendant to superior court trials. (*Sanderson*, *supra*, 17 Cal.2d at pp. 573-574.) To this list we would add that the necessarily small amount of money in controversy will often counsel against devoting significant resources to litigating a particular issue in small claims court. Subsequent litigation involving wholly separate causes of action may, and in this case did, involve significantly larger stakes justifying more vigorous litigation.

The *Pitzen* court offered a "second, more fundamental reason to limit the scope of the *Sanderson* exception. *Sanderson* and its progeny all involved a claim that collateral estoppel applied against a small claims *defendant* who had lost in the small claims court." "However, we are aware of *no* case in which the exception created in *Sanderson*, *supra*, 17 Cal.2d 563, to the usual application of collateral estoppel has been applied to allow a small claims plaintiff to relitigate an issue decided *against* him in small claims court." (*Pitzen*, *supra*, 120 Cal.App.4th at p. 1385.) In the *Pitzen* court's view, "fundamental fairness and the public policy embodied in the small claims statutory scheme require that the *Sanderson* exception be limited to issues decided against small claims defendants." (*Id.* at p. 1386.) The policies *Pitzen* relied on are the "'general principle that small claims proceedings [are to] be both speedy and final'" (*ibid.*), and the fact that plaintiff chooses the small claims forum whereas a defendant is forced into it.

We find that rationale unpersuasive for a number of reasons.

First and foremost, as we have noted above, it is simply inconsistent with binding precedent. As the *Pitzen* court conceded, "the broad language of these decisions *suggests* that small claims judgments may not be afforded collateral estoppel effect . . . ."

16

(*Pitzen*, *supra*, 120 Cal.App.4th at p. 1385, italics added.) In our view, the broad holding in *Sanderson*, reaffirmed in *Perez*, is not merely a suggestion.

Second, the *Pitzen* court relied on *Cook v. Superior Court* (1969) 274 Cal.App.2d 675, 678 for this rationale, but that reliance was misplaced. (*Pitzen*, *supra*, 120 Cal.App.4th at p. 1386.) In *Cook*, the plaintiff sued two defendants in small claims court, prevailing against one, but not the other. The losing defendant appealed. In the ensuing trial de novo, the superior court reversed the entire judgment, ruling that the losing small claims defendant was exonerated, but the prevailing small claims defendant was liable. (*Cook*, at p. 676.) On a writ of certiorari, the appellate court held the superior court lacked jurisdiction to enter judgment against the *prevailing* small claims defendant because a small claims plaintiff has no right to appeal, and thus the plaintiff is finally bound by the original judgment in favor of the defendant. (*Id*. at pp. 678-679.) *Cook* does not address res judicata at all, but instead concerns the rule prohibiting small claims plaintiffs from appealing. To the extent *Cook* has any indirect relevance to the doctrine of res judicata, its relevance is limited to the claim-preclusion aspect of res judicata, not issue preclusion. Accordingly it is not apt authority to support a conclusion that issue preclusion is appropriately applied to a small claims judgment.

As the *Pitzen* court acknowledged (*Pitzen*, *supra*, 120 Cal.App.4th at pp. 1382-1383), the *Sanderson* court made clear that its holding addressed *only* the collateral estoppel (i.e. issue preclusion) effect of a small claims judgment, not the doctrines of merger or bar that would apply to a plaintiff's subsequent suit on the same cause of action. The *Sanderson* court stated, "[A]lthough a judgment of any court whether of high or low jurisdiction, and of record or not, constitutes a complete bar against a second suit on the *same* cause of action, — in a second suit upon a *different* cause of action it constitutes but an estoppel or conclusive determination of such issues only as were actually raised and litigated. Inasmuch as the present litigation is based upon a *different* cause of action from that involved in the prior small claims suit, though tracing its origin

17

to the same transaction, we are here solely concerned with the latter aspect of the doctrine of *res judicata*." (*Sanderson*, *supra*, 17 Cal.2d at p. 573.)

Third, the fact that a small claims action is meant to be speedy and final is an insufficient basis, standing alone, to apply collateral estoppel. The *Sanderson* court specifically noted that small claims actions are meant to be speedy and efficient, but, rather than cite that as a basis to apply collateral estoppel, cited the informality of the forum as a reason *not* to. (*Sanderson*, *supra*, 17 Cal.2d at pp. 573-574.) Our high court's rejection of the application of nonmutual collateral estoppel in the context of arbitrations is instructive. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 824.) The *Vandenberg* court reasoned, "Limited judicial review is a well-understood feature of private arbitration, inherent in the nature of the arbitral forum as an informal, expeditious, and efficient alternative means of dispute resolution." (*Id*. at p. 831.) An agreement to arbitrate particular claims reflects each party's conclusion that the immediate stakes make it preferable to avoid the delay and expense of court proceedings, and instead to resolve the matter between themselves without resort to the judicial process. . . . [Citation.] But this does not mean each arbitral party also consents that issues decided against him by this informal, imprecise method may bind him, in the same manner as a court trial, in *all future* disputes, *regardless* of the stakes, against *all* adversaries, known and unknown." (*Id.* at p. 832.) The same reasoning applies to small claims plaintiffs. The fact that a plaintiff chooses a small claims forum for a particular dispute does not imply the plaintiff has chosen to be conclusively bound for all time by any issue that is decided to the detriment of future lawsuits, regardless of the stakes or context.

Finally, a plaintiff's inability to appeal a small claim's judgment, contrary to the *Pitzen* court's reasoning, counsels against application of collateral estoppel. (*Pitzen*, *supra*, 120 Cal.App.4th at p. 1386) "Whether collateral estoppel is fair and consistent with public policy in a particular case depends in part upon the character of the forum that first decided the issue later sought to be foreclosed. In this regard, courts

18

consider the judicial nature of the prior forum, i.e., its legal formality, the scope of its jurisdiction, and its procedural safeguards, *particularly including the opportunity for judicial review of adverse rulings*." (*Vandenberg*, *supra*, 21 Cal.4th at p. 829, italics added.) Unlike the defendant, the plaintiff in a small claims action cannot appeal the ruling, even where the small claims court made a clear legal error. (Code Civ. Proc. § 116.710, subd. (a); *Parada v. Small Claims Court* (1977) 70 Cal.App.3d 766, 769.) Thus, to the extent there is any distinction at all, there is *less* reason to apply collateral estoppel to a losing plaintiff in a small claims action.

For the foregoing reasons, we respectfully disagree with *Pitzen* and hold the trial court erred in applying collateral estoppel to the small claims action in this case.

*The Error was Harmless*

However, the error in applying collateral estoppel was harmless. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [reversal warranted only "'when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error'"].) We reach this conclusion for two reasons.

First, the trial court carefully limited the scope of its ruling to whether the FedEx letter offered into evidence in the small claims action was fraudulent. There were, essentially, three buckets of defamatory statements: (1) The claim that plaintiff falsified the FedEx letter thereby committing perjury in the small claims action; (2) plaintiff tendered an "unauthorized" check for the wig, and thus committed fraud and/or theft; and (3) plaintiff was taking bribes and awarding contracts to friends and family in connection with her position at the City of Anaheim, and was thus corrupt. Defendants were free to prove the truth of the second and third categories. The trial court found, however, that none of the defamatory statements were true. Thus, even if defendants had proved the

19

truth of their claim that the FedEx letter was false, defendants would still be liable for defamation.

Second, the only damages arose from the corruption allegations. The only evidence of harm to plaintiff's reputation or emotional distress was her testimony that she was "devastated" to read the corruption allegations and felt compelled to preemptively reveal the allegations to her supervisor so she could disprove them and not appear to be hiding anything. She testified that having to reveal such claims to her supervisor was humiliating and would likely impact her prospects for future promotions. She also testified to the emotional distress of the prospect of losing her job as a result of the corruption allegations.

Both the trial court and defendants recognized the corruption allegations were the principal, if not the only, damaging claims. As defendants' counsel stated during closing argument, "It also should be noted that [plaintiff's] claim about humiliation is connected to [the statements] that were posted on Yelp.com and MerchantCircle.com. They are not correlated to the Ripoffreport.com statement. In fact, why would she feel the need to go to her job and tell them about the Ripoffreport.com? She testified her justification for making that disclosure to her employers was because she was concerned of the backlash of . . . citizenry calling and being concerned about public corruption." Similarly, in (erroneously) sustaining an objection to evidence concerning the FedEx letter, the trial court stated, "And really, I think the bigger problem is elsewhere in these allegedly defamatory statements, the ones that" "accused plaintiff of a crime, accepting bribes." The allegations concerning the FedEx letter, therefore, did not play a significant role in the outcome of the trial.

*The Court Did Not Err In Excluding Plaintiff's Felony Conviction*

The record in this case shows that plaintiff had been convicted of a felony, but that felony was subsequently reduced to a misdemeanor pursuant to Penal Code

section 17, subdivision (b), and later dismissed pursuant to Penal Code section 1203.4. The trial court refused to admit evidence of plaintiff's felony conviction. Defendants claim that was error. We disagree.

Penal Code section 1203.4 permits a felon who has completed probation to apply to have the felony conviction dismissed. "A grant of relief under section 1203.4 is intended to reward an individual who successfully completes probation by mitigating some of the consequences of his conviction and, with a few exceptions, to restore him to his former status in society to the extent the Legislature has power to do so [citations]." (*Selby v. Department of Motor Vehicles* (1980) 110 Cal.App.3d 470.) With exceptions inapplicable here, a felony conviction dismissed pursuant to Penal Code section 1203.4 is not admissible to attack a witness's credibility. (Evid. Code § 788, subd. (c).)

Defendants maintain, nonetheless, that such evidence is admissible for other relevant purposes. Plaintiff contends, on the other hand, the felony conviction no longer exists and thus there is nothing to admit. We need not decide the issue, however, because assuming defendants are correct and the evidence is admissible for other relevant purposes, defendants have not articulated any relevant basis for admitting evidence of the conviction in this case.

Defendants offered the conviction "for the purpose of establishing [plaintiff's] character and reputation as well as to prove [defendant's] state of mind in publishing the statements purported to be defamatory."

The problem is, plaintiff's character was not at issue; her reputation was at issue. (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645 ["Defamation is an invasion of the interest in reputation"].) And as the trial court found, the mere fact of the conviction does not directly bear on reputation. Rather, it is people's *knowledge* of the conviction in the community. Certainly defendants could have elicited testimony from individuals who knew about the conviction and thought less of plaintiff as a result, but defendants disavowed any intention to bring in such witnesses. Further, the court *did*

21

permit defendants to elicit testimony from plaintiff that her supervisors knew about her conviction.

And as for defendants' state of mind, we fail to see the relevance. Perhaps defendants could have testified that they believed their statements to be true based on knowledge of the conviction, which might have been relevant to the issue of malice, but defendants made no such offer of proof. (See Evid. Code, § 354, subd. (a) [judgment shall not be reversed by reason of exclusion of evidence unless the error is prejudicial and the "substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"].) As such, the conviction itself was irrelevant beyond what the trial court permitted.

*Substantial Evidence Supports the Court's Finding of Malice*

Defendants claim there was no substantial evidence to support the trial court's finding of malice against Walsh. Again, we disagree.

"To show actual malice, plaintiff[] must demonstrate [defendants] either knew [the] statement was false or subjectively entertained serious doubt [the] statement was truthful. [Citation.] The question is not '"whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."' [Citation.]

"A defamation plaintiff may rely on inferences drawn from circumstantial evidence to show actual malice. [Citation.] 'A failure to investigate [fn. omitted] [citation], anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff [citations] — such factors may, in an appropriate case, indicate that the publisher himself had serious doubts

22

regarding the truth of his publication.'"   (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84-85.)

As a preliminary matter we note that defendants have not provided us with the vast majority of trial exhibits, and thus have provided an insufficient record to fully consider their contention.  (*Oliveira v. Kiesler* (2012) 206 Cal.App.4th 1349, 1362 ["It was [appellant's] burden . . . to present an adequate record for review.  [Citation.] Having failed to do so, the judgment must be affirmed"].)  For example, much of the evidence connecting Walsh and Wiggin Out to the Yelp.com and MerchantCircle.com publications was in the form of documents supplied in response to subpoenas to various Internet service providers, none of which were provided to us.  There was also a suggestion in the record that Walsh, acting through an account belonging to Wiggin Out with an entity called Privacy Partners, deleted the e-mail account used to post the Yelp.com and MerchantCircle.com statements, but again we were not provided those exhibits.  Indeed, while we were provided a reporter's transcript, much of the testimony is *about* the exhibits we do not have, which, of course, impedes our review of the transcript.  Nonetheless, even the partial record before us contains substantial evidence to support the court's finding.

Walsh contends she held an honest belief that the statements posted on Ripoffreport.com were true based on her experience in circumstances surrounding the small claims action.  Even if that is true, however, Walsh offers no argument concerning the corruption allegations.  Walsh's contention at trial was that she did not post those statements, so she did not even attempt to justify them.  The trial court found otherwise. Crediting that finding, there was sufficient evidence to support a finding of malice. Plaintiff testified that she does not even work in the planning department at the City of Anaheim and that decisions about awarding contracts are made at much higher levels than her position and generally require city council approval.  Further, Walsh plainly had a hostile relationship with plaintiff as evidenced by the harsh statements Walsh admitted

23

making about plaintiff in the Ripoffreport.com posting. The patently false nature of the claims, Walsh's false denial that she posted the statements, and Walsh's hostile attitude towards plaintiff are substantial evidence to support the trial court's finding of malice.[2]

*Defendants Waived Their Appeal of Sanctions Awarded to West Coast*

Defendants challenge the propriety of two discovery orders in favor of nonparty West Coast. The first order denied defendants' motion to compel compliance with a business records subpoena directed to West Coast and awarded West Coast sanctions in the amount of $1,787.50. The second order was a sanctions order in favor of West Coast in the amount of $1,512.50 based on a motion to compel that defendants filed but withdrew after West Coast filed an opposition.

Defendants did not serve West Coast with either the notice of appeal or any of the briefs on appeal. Plaintiff, for her part, did not oppose the motions below and has declined to offer any argument on West Coast's behalf here on appeal.

"[F]ailure to serve appellant's opening brief upon any adversary effects" "a waiver or abandonment of the appeal as to the party or parties not served" "and the court in the exercise of its inherent power may dismiss the appeal on its own motion so far as concerns the respondent who has not been served with the brief." (*Cabana Nutria, Inc. v. The Way, Inc.* (1958) 163 Cal.App.2d 485, 488.) "However, as a dismissal works an affirmance, it will suffice in this case to affirm the order in its entirety." (*Ibid.*)

West Coast has not been given notice of the appeal, and thus it would violate fundamental notions of due process to adjudicate the challenged orders in West Coast's absence. Accordingly, we exercise our inherent authority to deem that aspect of the appeal abandoned and affirm the discovery orders.

---

[2] Defendants also claim there is no evidence of malice by Wiggin Out. The court did not make any finding of malice as to Wiggin Out, and thus did not award punitive damages against Wiggin Out.

24

## DISPOSITION

The judgment is affirmed.  Plaintiff shall recover her costs on appeal.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

25