Filed 12/1/15  Juarez v. Dish Network CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| OSCAR JUAREZ et al., | B256235 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC478065) |
| v. | |
| DISH NETWORK CALIFORNIA SERVICE CORPORATION et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Abraham Khan and Victor E. Chavez, Judges.  Reversed with directions.

Daniel M. Graham for Plaintiffs and Respondents.

Littler Mendelson P.C., Marlene S. Muraco, Neda N. Dal Cielo, and Elisa Nadeau for Defendants and Appellants.

Plaintiff Oscar Juarez (Juarez), a former employee of defendant Dish Network LLC (Dish), was terminated after a customer accused him of stealing a piece of jewelry. Dish investigated, and although it could not determine whether Juarez took the jewelry, it concluded that the "conservative thing to do is to separate [Juarez's] employment."

Juarez sued for wrongful termination, breach of contract, and defamation. The court granted summary adjudication for Dish on the wrongful termination and breach of contract claims, but allowed a jury to decide Juarez's claim that he had been defamed by Dish's statements that his version of events "appeared to be less than credible" because he had "not be[en] forthcoming" after the theft allegation. The jury found Dish liable for defamation and awarded Juarez past economic losses of $258,605.

We reverse. An essential element of a cause of action for defamation is " 'the existence of falsehood' " (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*))—i.e., a *provably false* assertion of *fact* (*Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1270). The statements on which Juarez relies—that he appeared "less than credible" and "not . . . forthcoming"—are subjective judgments, not assertions of fact. Accordingly, because Juarez failed to present evidence of an essential element of his defamation claim, the judgment must be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I.

### The Parties

Dish is a provider of satellite-based television. From 2004 to 2011, Juarez worked for Dish as a "field service specialist," also referred to as an "installer" or "technician." In this capacity, Juarez was responsible for installing, upgrading, and repairing Dish satellite television equipment in customers' homes.

---

[1] The following factual discussion is drawn from the testimony at trial.

## II.

## A Customer Accuses Juarez of Theft;

## After Investigating, Dish Terminates Juarez

On July 19, 2011, Juarez installed equipment at a customer's residence in Wilmington, California. Sometime thereafter, the customer contacted Dish and reported that a ring had been stolen from her during the installation. The complaint was received on August 2, 2011 by Damon Candelaria, a member of Dish's "Resolution Team," the group responsible for receiving customer complaints and damage claims.

Candelaria provided notice of the theft allegation to Carlos Valadez, the installation manager of the Hawthorne office where Juarez worked, and asked that the allegation be investigated internally. Valadez forwarded the request to Jill Yoshimi (Regional Human Resources Manager), Frank Sandoval (General Manager of the Hawthorne office), and Mike Barthelme (Regional Operations Manager).

Yoshimi called Juarez on August 2, 2011, and told him she had some questions about an installation. She told him the customer's name and address, the city where the customer lived, the date of the installation, and the kind of equipment Juarez had installed, to "try[] to refresh his memory." Yoshimi testified that she repeated the same information about five times, and each time Juarez said he did not recall the job or the customer. According to Yoshimi, Juarez did not recall anything about the job or the customer until she revealed the allegation of theft. Immediately thereafter, Juarez "then recalled a lot of details about the customer. And he even mentioned that he recalled there was a laptop in the customer's living room." Based on Juarez's response, Yoshimi formed the impression that Juarez had not been forthcoming. However, she "couldn't tell if he [took] the ring."

Juarez had a somewhat different recollection of his conversation with Yoshimi. He agreed that she told him the customer's name, address, and phone number, as well as the kinds of receivers he had installed in the customer's home. Yoshimi asked Juarez why he could not recall the job or customer, and he said he did 10 to 15 jobs per week, and Yoshimi was asking him about an installation he had done three weeks earlier.

3

Yoshimi repeated the customer's information for about 20 minutes, and then told Juarez that the reason she was calling was that the customer had accused him of stealing jewelry from her home. Juarez said he would never steal anything from anyone's home. Yoshimi told him that due to the allegation, Dish would have to put him on administrative suspension. About two minutes later, Juarez finally recalled the customer and described her and the home to Yoshimi.

Yoshimi also spoke with the customer about the theft allegation. The customer said she looked for the ring immediately after the installation but could not find it. She described the ring as a cat's eye ring with a small diamond in a gold setting. The customer said she called Dish the day after the installation and was told to report the theft to "FHTM Fortune High Tech Marketing." She did so, but never received a call back; she therefore contacted Dish again and spoke with someone in the Corporate Field Resolutions department. Yoshimi testified that she found the customer to be credible based on her demeanor and because she did not ask for anything from Dish other than the ring back.

On August 5, 2011, Yoshimi received the results of a background check of Juarez. He had no previous disciplinary action involving theft.

On August 8, 2011, Yoshimi sent an email to Jim Hankins (Director of Compliance and Ethics), Keri Francavilla (an investigator with Compliance and Ethics), Deborah Cooper (Director of Human Resources), Ron Grady (Vice President, Western Region), Atul Raj (Regional Director for the Southwest Region), Mike Barthelme, and Frank Sandoval regarding her investigation of Juarez. In relevant part, the email said, "On Tuesday, August 2, Jill Yoshimi interviewed Oscar Juarez. When Jill asked about the details of the install, Oscar did not recall the customer or anything about the installation. Jill continued to give Oscar all the information about the installation such as the job type, receivers, address, and how long he took on the job. It wasn't until Jill told Oscar that the customer is making allegations about missing jewelry he was then able to remember that specific job. Oscar denied taking jewelry from the customer. He did not see anything of value at the customer's house other than a laptop in the living room. . . .

4

[¶] On August 2 & 3, Jill was able to get in contact with customer, [name redacted]. Ms. [] alleged that our technician took her ring; description of the ring, Cats Eye stone with a small diamond on top in a gold setting. The ring has been in the family for years and it was her great grandmother's. She states that the ring was in the master bedroom on a dresser on top of a glass piece. Ms. [] looked for the ring after the installation was completed and called DISH the following day to report it missing."

On August 10, 2011, Yoshimi participated in a conference call with Ron Grady, Atul Raj, Mike Barthelme, and Keri Francavilla. Yoshimi related the customer's theft allegation, her conversation with Juarez, and her impression that Juarez had not been forthcoming. She did not say that she had concluded that Juarez had stolen the ring. Instead, she said her investigation was inconclusive: "We [couldn't determine] if [he] did or did not take the ring." Based on Yoshimi's investigation, Raj and Barthelme recommended reinstating Juarez "because he has no previous issues with customer complaints or allegations of theft." Grady recommended terminating Juarez "based on the technician's statement by not providing Jill any of the details until revealing the allegations." No one on the conference call expressed the opinion that Juarez had stolen the ring. However, everyone on the call agreed that Juarez had violated the company's investigations policy.

On August 13, 2011, Keri Francavilla sent an email to Erik Carlson (Executive Vice President, Dish Network) and Stephen Wood (Executive Vice President, Human Resources), with copies to Hankins, Cooper, Yoshimi, Raj, Barthelme, and Grady, which said as follows: "The team has looked into the allegation of theft of a ring by our technician. The allegation is inconclusive and the team is split on the recommendations. [¶] Important facts to consider:

"—We cannot say if the tech did or did not take the ring.

"—We believe the customer[']s version of events and details are credible.

"—The technician appears a little less credible in that he was only able to recall the details of this particular job after he was told there was an allegation of theft of jewelry.

5

"—No police report was filed.

"—Background is clear.

"—Tech[] is a long term employee with relatively good performance. [¶]

"Ron [Grady] feels based on the interview the tech[']s credibility is somewhat lower and we should term. [¶]

"Atul [Raj] and Mike [Barthelme] would prefer to retain the tech based on what they know of the individual and his performance and do not feel there is enough to support the allegation of theft. [¶]

"Please provide your thoughts on this one or advise if there is any other information or clarification you need."

Stephen Wood replied by email: "In these 'split' cases – I go with the highest ranking person's recommendation."

The same day, Deborah Cooper emailed Wood, Francavilla, and Hankins, as follows: "Ron and I talked in detail about this case last week. It truly is one where we don't know what happened. The only thing that stands out is that the tech had no recollection of the customer or the job until Jill told him about the allegation of the theft of the ring. Then the tech remembered the job and [the] customer, stat[ing] that there was a laptop but there was no jewelry. It struck us as odd that the ring triggered his memory but then he claimed he didn't see a ring. [¶] Therefore, although we recognize we might have this one wrong, the conservative thing to do is to separate employment[,] which is what Ron and I recommend."

Erik Carlson responded: "I will support Ron on this . . . and agree with Stephen's view on split cases."

On August 26, 2011, Dish terminated Juarez's employment. During the exit interview, Yoshimi reviewed with Juarez a termination memo, which said as follows: "On August 2, 2011, a customer contacted DISH Network with an allegation of theft of jewelry from the customer's home involving Mr. Juarez. An investigation was conducted regarding the allegation. [¶] Per the employee handbook on page 15, DISH Network has the right, at any time, to investigate matters involving suspected or alleged violations of

6

DISH Network policies, practices, expectations, any applicable law or any other behavior deemed relevant to employment with DISH Network. You are expected to cooperate fully with DISH Network investigations. You are expected to maintain confidentiality and answer questions truthfully, completely, and to the best of your ability. [¶] We cannot determine if Mr. Juarez took the customer's jewelry, however, his version of the events appears to be less than credible by not being forthcoming during his interview. The decision has been made to terminate his employment effective August 26, 2011 for Policy Violation."

Juarez testified that during the August 26, 2011 interview, Yoshimi told him that she felt he had not been truthful with her during their original phone call on August 2, 2011. He said, however, that neither Yoshimi nor anyone else at Dish ever accused him of stealing.

Following his termination, Juarez sent a letter to Erik Carlson asking to be reinstated. Among other things, Juarez said in the letter that the reason for his termination "was not the outcome of the theft [*sic*] but the fact that when I had the initial phone call with Jill [Yoshimi] I was 'less than credible . . . and forthcoming during [my] interview.' [¶] . . . I feel that this decision was unjust and uncalled for taking into account my work record, ethics, and time with the company."

### III.

### Juarez's Attempts to Find New Employment

It was undisputed that Dish had a policy not to "provide performance-based references for current or previous employees," but only "to verify dates of employment, start date, end date and job title." It was also undisputed that consistent with that policy, Dish did not publish any information about Juarez's termination to anyone outside the company. However, Juarez testified that when asked during job interviews with prospective employers why he was no longer working for Dish, "I told them, well, there was an incident where a customer . . . allegedly said I stole something; and my HR felt like I was lying to her and she let me go." He said he made similar disclosures to members of his family and to several friends when he asked them if their employers were

7

hiring.  He also submitted a written job application under penalty of perjury in which he stated that he left Dish because "there was an accusation but nothing was ever proven, so both sides decided to go their separate ways."  Juarez said that statement was "somewhat" true.

Juarez ultimately got a job in May 2013 working with adults with disabilities.  In July 2013, he was offered and accepted a job with a casino.

## IV.

## The Present Action; Dish's Motion for
## Summary Judgment or Summary Adjudication

Juarez and his wife, Martha Juarez, filed the present action on January 31, 2012, against six Dish entities:  Dish Network LLC, Dish Network Corporation, Dish Network California Service Corporation, EchoStar Satellite Services LLC, EchoStar Satellite Corporation, and EchoStar Corporation.[2]  Juarez alleged four causes of action: (1) discharge in violation of public policy; (2) breach of implied-in-fact contract; (3) defamation; and (4) breach of implied covenant of good faith and fair dealing. Martha Juarez alleged an additional cause of action for loss of consortium.

In July 2013, Dish moved for summary judgment or, in the alternative, for summary adjudication of each of Juarez's causes of action.  On October 15, 2013, the trial court denied the motion for summary judgment, but granted summary adjudication of the causes of action for breach of implied-in-fact contract, breach of implied covenant of good faith and fair dealing, and discharge in violation of public policy.  The court denied summary adjudication as to defamation.

---

[2]     Throughout this opinion, we refer to the various Dish entities collectively as "Dish."

# V.

## Trial and Judgment

The case went to trial on the single remaining cause of action for defamation. Plaintiff claimed he had been defamed in two different ways: by the internal discussions of the theft investigation *within* Dish, and because he was compelled to "republish" to potential employers the fact that he had been accused of theft and found by the company not to have been credible. His counsel argued that these discussions and compelled republications were assertions of fact, not opinion: "There's no opinion here. These are facts. He was less than credible, according to Dish. He didn't completely cooperate. He was untruthful; i.e., he's a liar and more or less a thief. I mean, that's the reasonable interpretation of all these accusations. And they're all based on the employee handbook, which you're going to have in evidence . . . . [¶] What have they proven? What evidence have they submitted to you that he didn't cooperate, that he was untruthful, that he was less than credible? These are not opinions, ladies and gentlemen. These are statements of fact which must be communicated to future employers."

Dish's counsel argued to the jury that the only people with whom Dish discussed the investigation of the theft allegations were Dish employees, that Juarez was under no obligation to "republish" the allegedly defamatory statements, and that all of the alleged defamatory statements were opinion, not fact.[3]

Following deliberations, the jury returned the following special verdict:

Question No. 1: Did Juarez prove that it is more likely true than not true that any agent or employee of Dish made one or more of the following statements to Juarez:

     (1)    "that '[Plaintiff's] version of the events appeared to be less than credible by not being forthcoming during his interview'; OR

     (2)    "that 'Oscar Juarez did not cooperate fully with DISH'S investigator regarding an allegation of theft of jewelry from a customer's home'; OR

---

[3]     At the close of evidence, Dish made a motion for nonsuit as to a variety of issues. The trial court granted a nonsuit as to (1) punitive damages and (2) Juarez's claim that Dish "made a statement that Mr. Juarez was involved in a theft of jewelry."

9

(3) "that 'Oscar Juarez did not answer questions truthfully regarding an allegation of theft of jewelry from a customer's home'; OR

(4) "that 'Oscar Juarez did not answer questions completely regarding an allegation of theft of jewelry from a customer's home'; OR

(5) "that 'Oscar Juarez did not answer questions to the best of his ability regarding an allegation of theft of jewelry from a customer's home.' "

Answer: Yes.

Question No. 1(A): Please identify which of the statements listed above plaintiff proved were made to him. Answer: 1, 2, 3, 4, 5.

Question No. 2: Did Juarez prove that it is more likely true than not true that one or more of the statements you identified in response to Question 1(A) is a statement of fact and not a statement of opinion? Answer: Yes.

Question No. 2(A): Please identify which of the statements listed above plaintiff proved was a statement of fact. Answer: 1, 2, 3, 4, 5.

Question No. 3: Was any statement that you identified in response to Question No. 2(A), above, communicated [by DISH] to someone who was NOT an "interested party"? Answer: Yes.

Question No. 3(A): Please identify which of the statements listed above was communicated to someone who was not an "interested party." Answer: 1, 2, 3, 4, 5.

Question No. 4: Did Juarez prove that it is more likely true than not true that the individual(s) who made the statement(s) that you identified in response to Question 3A above, made that statement with "actual malice"? Answer: Yes.

Question No. 4(A): Please identify which of the statements listed above were made with "actual malice"? Answer: 1, 2, 3, 4, 5.

Question No. 5: Did Juarez prove that it is more likely true than not true, that he was under strong pressure to communicate one or more of the statements that you identified in response to Question 4A to any prospective employer? Answer: Yes.

Question No. 5(A): Please identify which of the statements listed above plaintiff was under a strong pressure to communicate to a prospective employer? Answer: 1, 2, 4.

10

Question No. 6: Did Juarez establish that it is more likely true than not true that when one or more of the statements identified in response to Question 5(A) was made, the person who made the statement would have known that Juarez would be under strong pressure to communicate the statement to a prospective employer? Answer: Yes.

Question No. 6(A): Please identify which of the statements listed above plaintiff proved the person who made the statements should have known Juarez would be under a strong pressure to communicate to a prospective employer? Answer: 1, 2, 4.

Question No. 7: Did Juarez prove that it is more likely true than not true that he communicated one or more of the statements you identified in response to Question 6A to any prospective employer? Answer: Yes.

Question No. 7(A): Please identify which of the statements listed above plaintiff communicated to a prospective employer? Answer: 1, 2, 4.

Question No. 7B: Please identify the date(s) that Plaintiff proved he made the statements to a prospective employer. Answer: March 2013.

Question No. 8: Were all the statements you identified in response to 7A substantially true? Answer: No.

Question No. 8A: Which statements identified above were not substantially true? Answer: 1, 2, 4.

Question No. 9: Did Juarez prove that it is more likely true than not true that any person to whom one or more of the statements that you identified in response to Question 8(A) was communicated reasonably understood that it tended to injure Juarez in his particular occupation as a Satellite Technician? Answer: Yes.

Question No. 9(A): Please identify by number which statements were reasonably understood by the hearer as likely to injure Juarez in his occupation. Answer: 1, 2, 4.

Question No. 10: Did Juarez prove that it is more likely true than not true that one of the statements you identified in response to Question 9A was a substantial factor in causing Juarez actual harm? Answer: Yes.

Question No. 10(A): Please identify by number which statements were a substantial factor in causing Juarez harm. Answer: 1, 2, 4.

11

Question No. 11: Did Juarez prove that it is more likely true than not true that he suffered actual damages as a result of one or more of the statements that you identified in response to 10(A) being communicated by Juarez to any prospective employer? Answer: Yes.

Question No. 11(A): Please identify which of the statements plaintiff proved he suffered damages as a result of. Answer: 1, 2, 4.

Question No. 11(B): What are Juarez's damages?

Total past economic loss: $258,605.30

Total past non-economic losses: $0

TOTAL: $258,605.30[4]

## VI.

## Motion For New Trial; Appeal

Dish moved for a new trial on the grounds that (1) the trial court erred in refusing to instruct the jury that Juarez's damages for compelled self-publication were limited to those damages he sustained *after* the date of such compelled self-publication; and (2) the jury's damages award was excessive. On April 4, 2014, the trial court denied the motion on both grounds. Dish timely appealed.

## CONTENTIONS

Dish contends there was no substantial evidence that (1) Dish made any false statements about Juarez, (2) the allegedly defamatory statements were assertions of fact, (3) the allegedly defamatory statements were not privileged, (4) Juarez was under a strong compulsion to publish the allegedly defamatory statements to prospective employers, and (5) Juarez suffered actual damages in the amount awarded. Dish also contends that (6) the special verdict form was fatally defective.

Juarez contends that each element of his cause of action for defamation was supported by substantial evidence, and there were no defects in the special verdict form.

---

[4] On a separate special verdict form, the jury found for Dish on Martha Juarez's loss of consortium claim.

12

As we now discuss, we conclude that the allegedly defamatory statements were subjective judgments, not provably false assertions of fact. As such, they are not actionable defamation as a matter of law. Because this conclusion requires reversal of the judgment for Juarez, we do not address any of Dish's remaining claims.

## DISCUSSION

## I.

## Applicable Law

*A. Defamation Generally*

Defamation is "a false and unprivileged publication" that exposes a person "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) To state a case for defamation, a plaintiff must establish five elements: " '(1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.' " (*Sanders v. Walsh* (2013) 219 Cal.App.4th 855, 862.)[5]

" 'The *sine qua non* of recovery for defamation . . . is the existence of a falsehood.' [Citation.]" (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259.) Thus, a claim for defamation fails unless the challenged statement can be reasonably understood to express or imply a "*provably false*" assertion of fact. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19-20, italics added; see also *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1607-1608; accord, *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 13 ["there is also constitutional protection 'for

---

[5] Statements that contain such a defamatory charge directly, and without the need for explanatory matter, are libelous per se. (Civ. Code, § 45a.) A statement can also be libelous per se if it contains a charge by implication from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter. (*McGarry*, *supra*, 154 Cal.App.4th at p. 112.) "However, if the listener would not recognize the defamatory meaning without 'knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons' [citation], the matter is deemed defamatory per quod and requires pleading and proof of special damages. [Citation.]" (*Ibid.*)

13

statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual' "].)

To ascertain whether the statements in question are provably false factual assertions, courts consider the " 'totality of circumstances' "—i.e., "the meaning of the language in context and its susceptibility of being proved true or false." (*Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 725 (*Moyer*); see also *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 156, citing *Nygard, Inc. v. Uusi–Kerttula* (2008) 159 Cal.App.4th 1027, 1049.) " 'Where the language of the statement is "cautiously phrased in terms of apparency," the statement is less likely to be reasonably understood as a statement of fact rather than opinion.' " (*Dong v. Board of Trustees* (1987) 191 Cal.App.3d 1572, 1584.)

"The ' "crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." ' [Citation.]" (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 427.) Only if a statement "is 'ambiguous and cannot be characterized as factual or nonfactual as a matter of law' " should a jury be permitted to determine whether the statement contains an actionable assertion of fact. (*Ibid.*) " 'The allocation of functions between court and jury with respect to factual content is analogous to the allocation with respect to defamatory meaning in general. On the latter issue, the court must first determine as a question of law whether the statement is reasonably susceptible of a defamatory interpretation; if the statement satisfies this requirement, it is for the jury to determine whether a defamatory meaning was in fact conveyed to the listener or reader. [Citations.] Similarly, it is a question of law for the court whether a challenged statement is reasonably susceptible of an interpretation which implies a provably false assertion of actual fact. If that question is answered in the affirmative, the jury may be called upon to determine whether such an interpretation was in fact conveyed.' " (*Id.* at p. 428.)

14

*B.* *"Subjective Judgments" Are Not Provably False Statements of Fact*

In evaluating defamation claims, California courts have distinguished between "verifiable facts" and "subjective judgments." (*Moyer*, *supra*, 225 Cal.App.3d at p. 725.) "The essential difference between a statement of fact and a statement of opinion is that a statement of fact implies a provably false factual assertion while a statement of opinion does not." (*Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1270.) For example, a statement that an individual is " 'extremely rude' " "is not defamatory because it does not make a factual assertion capable of being proven true or false. Whether someone is 'extremely rude' is a subjective judgment of the person making the statement." (*Ibid.*)

The Court of Appeal addressed the demarcation between objective fact and subjective judgment in *McGarry*, *supra*, 154 Cal.App.4th at p. 102. There, after the University of San Diego (University) terminated plaintiff McGarry's employment as its head football coach, the University president met with the parents of the football players. The parents asked why McGarry had been terminated, and the president responded that she could not comment. One parent, after stating that the timing of the termination was unfortunate, asked, " 'Was it criminal or morality dealing with this school? Yes or No? [¶] . . . [¶] If you say yes, I can live—I'll back you 100 [percent]. If you say no, your timing's bad and I can't back you [any] more. Criminal or morality?' " The president eventually responded, " 'I can say that Coach McGarry was not involved to our knowledge in any criminal activity.' " (*Id.* at p. 105.)

McGarry sued the University and others for defamation, among other things. (*McGarry*, *supra*, 154 Cal.App.4th at p. 102.) The defendants moved to strike the defamation claims pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16. The trial court granted the anti-SLAPP motion, and McGarry appealed. (*McGarry*, at p. 103.)

The Court of Appeal affirmed. Among other things, it concluded that McGarry was not likely to prevail on his claim that the president's statement to the parents was defamatory because it "was not reasonably susceptible of being interpreted to imply a provably false assertion of fact." (*McGarry*, *supra*, 154 Cal.App.4th at p. 116.) The

15

court explained: "[E]ven assuming we accepted McGarry's claim that [the president] impliedly asserted he had engaged in some unspecified immoral behavior, the statement still is incapable of being interpreted as implying a *provably false* assertion of *fact*. Behavior that might qualify as immoral to one person, although being perfectly acceptable to another person, demonstrates that an amorphous assertion of immoral behavior is within the range of statements of opinion that are not actionable. [¶] Because [the president's] statement contains no hint of what conduct she believed McGarry had engaged in that would be immoral, her statement neither contained nor implied a provably false assertion of fact, but at most implied an opinion. . . . 'Indeed, the Court could not instruct the jury on how to evaluate the truth of a charge of immorality without entering an age old debate better left to philosophers.' " (*Id.* at pp. 116-117; see also *Moyer*, *supra*, 225 Cal.App.3d at p. 725 [statements that a teacher was " 'a babbler' " and " 'the worst teacher at [the school]' " were not actionable because they were expressions of the speaker's "subjective judgment" that "contain[ed] no verifiable facts"].)

The court applied these concepts to a defamation action arising out of an employee's performance review in *Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958 (*Jensen*). There, the plaintiff sued his employer after receiving an unfavorable performance evaluation. He was subsequently terminated. Plaintiff's suit did not allege wrongful termination or constructive discharge, but proceeded solely on the claim that that the unfavorable performance review was libelous and in breach of the implied covenant of good faith and fair dealing. (*Id.* at p. 967.) The trial court granted a nonsuit following plaintiff's opening statement, and plaintiff appealed. (*Id.* at p. 969.)

The Court of Appeal affirmed. It noted that the communication at issue was an *evaluation* of plaintiff's performance, prepared by plaintiff's manager in the course of his designated duties: "[T]he word 'evaluation' denotes opinion, not fact. 'Evaluation' is defined in Webster's Third New International Dictionary (1981) page 786, as '. . . the act or result of evaluating: Judgment Appraisal, Rating, Interpretation.' To 'evaluate' is: ' . . . to examine and judge concerning the worth, quality, significance, amount, degree, or condition of.' (*Ibid.*) The dictionary definition is not necessarily dispositive of the

16

fact/opinion issue, but it certainly implies the defendants' intended legitimate purpose of the document, i.e., its use as a management tool for examining, appraising, judging and documenting the employee's performance." (*Jensen, supra,* 14 Cal.App.4th at p. 970.)

Further, the court noted that the contents of the evaluation—including that plaintiff had not " 'increased his skill,' " was not " 'pulling his weight,' " appeared to lack concern for management's need for information, had " 'weak' " knowledge of project management and process control, displayed " 'questionable judgment,' " displayed a " 'lack of attention' " to tasks and " 'overall communication with the team,' " and was the subject of a " 'tremendous amount of negative feedback' "—were statements of opinion, not fact. (*Jensen*, *supra*, 14 Cal.App.4th at p. 971 & fn. 14.) Accordingly, the court held that "unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior [citation], it cannot support a cause of action for libel. This is true even when the employer's perceptions about an employee's efforts, attitude, performance, potential or worth to the enterprise are objectively wrong and cannot be supported by reference to concrete, provable facts." (*Id.* at p. 965.)

The court noted finally that its conclusion was consistent with the California Supreme Court's holding in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, that tort remedies are not available for breach of the implied covenant of good faith and fair dealing in an employment contract. (*Jensen*, *supra*, 14 Cal.App.4th at p. 972.) While noting that employees frequently deny the basis for an employer's criticism, "we are compelled to conclude the court is an inappropriate forum for resolution of this grievance. No matter the denomination of the cause of action, employers should neither be required to justify performance evaluations by reference to objectively provable facts, nor subjected to fear of liability for good faith, but mistaken, judgments about the value of an individual employee to the business enterprise." (*Id.* at pp. 974-975.)

17

## II.

## Dish's Allegedly Defamatory Statements Were Non-Actionable Because They Were Subjective Judgments, Not Verifiable Assertions of Fact

Plaintiff argued to the jury that Dish communicated to him five defamatory statements about the reasons for his termination, which he was under a strong pressure to communicate, and did communicate, to prospective employers. The jury found that Juarez was harmed by the publication of *three* of the allegedly defamatory statements (identified as statements 1, 2, and 4 on the special verdict form), as follows:

(1) Juarez's "version of the events appeared to be less than credible by not being forthcoming during his interview";

(2) Juarez "did not cooperate fully with Dish's investigator regarding an allegation of theft of jewelry from a customer's home"; and

(4) Juarez "did not answer questions completely regarding an allegation of theft of jewelry from a customer's home."

The first allegedly defamatory statement—that Juarez's "version of the events appeared to be less than credible by not being forthcoming during his interview"—is not actionable as a matter of law because it expresses Yoshimi's subjective evaluation of Juarez's demeanor and willingness to answer questions during his interview, *not* a provably false assertion of fact. Had Yoshimi stated that Juarez had lied (or "is a liar"), that assertion could potentially have given rise to a defamation claim because an accusation of lying "implies a knowledge of facts which lead to the conclusion that [the plaintiff] told an untruth." (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18.) In contrast, Yoshimi's statement did not imply knowledge of facts leading to the conclusion that Juarez told an untruth—to the contrary, Yoshimi expressly *disclaimed* such knowledge, stating that she "*could not determine* if Mr. Juarez took the customer's jewelry." *All* the statement said was that Juarez "appeared" (to Yoshimi) not to be "forthcoming," and therefore to be "less than credible." Like the statements in *McGarry* and *Jensen*, Yoshimi's subjective evaluation of Juarez's apparent credibility is

18

nonactionable because it cannot be proved true or false. (See *Dong v. Board of Trustees* (1987) 191 Cal.App.3d 1572, 1587 [phrases " 'I claim that' " and " 'I consider that' " "are plainly expressions of opinion"].)

For the same reasons, the second and fourth allegedly defamatory statements, like the first statement, are statements of *opinion*, not fact, and thus are not actionable. But there is an even more fundamental problem with these alleged statements: There was no evidence at trial that these statements were either made to Juarez or published to any potential employers. The evidence at trial was that the only communications between Dish and Juarez about the reasons for his termination were during a brief meeting on August 26, 2011, when Yoshimi told Juarez he was being terminated. Juarez testified that Yoshimi presented him with a termination memorandum and told him she felt he had not been truthful with her during their original phone call on August 2. The memorandum said that a customer had accused Juarez of jewelry theft, and noted Juarez's obligation, as stated in Dish's employee handbook, to "cooperate fully with DISH Network investigations" and to "answer questions truthfully, completely, and to the best of your ability." The termination memorandum then stated as follows: "We cannot determine if Mr. Juarez took the customer's jewelry, *however, his version of the events appear[ed] to be less than credible by not being forthcoming during his interview*. The decision has been made to terminate his employment effective August 26, 2011 for Policy Violation."[6] (Italics added.)

There is nothing in the termination memorandum or Juarez's testimony to support the jury's finding that Dish communicated that Juarez "did not cooperate fully with Dish's investigator regarding an allegation of theft of jewelry from a customer's home" or that Juarez "did not answer questions completely regarding an allegation of theft of jewelry from a customer's home." Although the termination memorandum referenced

---

[6] On appeal, Juarez asserts that the special verdict questions were based on the termination memorandum and Yoshimi's August 8, 2011 email summarizing her investigation. The August 8 email is summarized in the Factual and Procedural Background, above; it makes no assessments of Juarez's truthfulness or cooperation.

the obligation of employees to "cooperate fully" and to "answer questions . . . completely," the memorandum did not accuse Juarez of failing to have done so. And, as we have said, Juarez has not identified any other evidence to support the conclusion that Yoshimi or any other Dish employee told Juarez that he did not cooperate fully or answer questions completely.

We note in conclusion that if defamation cases like the present one are allowed to proceed, they create a real potential to stifle communication in the workplace. "Defamation litigation is costly. The expenditure of time, resources, and money required to defend a [defamation claim] inevitably will induce self-censorship by employers. [Citation.] The consequent harm to employees will be significant. Performance evaluations, which often inform discharge decisions, are a standard feature of modern management practices, and widely are endorsed as valuable to employees and employers alike. [Citation.] Beneath a dangling sword of defamation, employers are unlikely to provide employees with any reasons for employment decisions, including discharge, depriving employees of any opportunity to contest those decisions. [Citation.] There is surely nothing more harmful to a discharged employee who must tell a prospective employer, 'I don't know why I was fired. I was never given a reason.' " (*White v. Blue Cross and Blue Shield of Massachusetts, Inc*. (2004) 442 Mass. 64, 70 [809 N.E.2d 1034, 1038]; see also *Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd*. (2002) 100 Hawaii 149, 172 [58 P.3d 1196, 1219] [" 'The potential for defamation liability every time an employee is terminated would chill communications in the work place, preventing employers from disclosing reasons for their business decisions, and would negatively affect grievance procedures intended to benefit the discharged employee.' "]; *Sullivan v. Baptist Memorial Hosp*. (Tenn. 1999) 995 S.W.2d 569, 573 ["the potential for defamation liability every time an employee is terminated would chill communications in the work place."]; *Rice v. Nova Biomedical Corp*. (7th Cir. 1994) 38 F.3d 909, 912 [expanding defamation claims in employment context "makes it impossible for an employer to communicate his grounds for discharging an employee to the employee even confidentially without incurring a grave risk of being sued for defamation."].)

20

## DISPOSITION

The judgment is reversed with directions to the trial court to enter judgment for Dish.  Dish is awarded its appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                    EDMON, P. J.


We concur:



        ALDRICH, J.



        JONES, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21